Phillip Wayne LOOMIS *v.* STATE of Arkansas

CR 77-30                                    551 S.W. 2d 546

Opinion delivered June 13, 1977
(In Banc)

*Don Langston* and *Hubert Graves,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Jackson Jones,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellant Loomis was found guilty of the crimes of rape and burglary alleged to have been committed on 3 March, 1976. He alleges three points for reversal, but concedes that one of them depends entirely upon the other two. Since that is so, we will discuss only two points, i.e., alleged error in denying his motions to suppress evidence, first, of fingerprint identification, and then, of his confession. We find merit in neither point and affirm.

Appellant first contends that his fingerprints were taken by illegal detention and the resulting evidence incriminating him was the fruit of the tree thus poisoned, relying entirely on *Davis* v. *Mississippi,* 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969). He argues that this action is in violation of the Fourth and Fifth Amendments to the U.S. Constitution and Art. 2 §§ 8 and 15 of the Arkansas Constitution. We find no violation of either constitutional provision of either constitution and find this case outside the orbit of *Davis.* The questioning of Loomis and the taking of his fingerprints were not a part of a "dragnet" operation of the type conducted in *Davis,* and there was no detention of Loomis for the sole purpose of obtaining fingerprints. The distinctions here outnumber the similarities.

In this case, a well organized investigation, which consumed some 2400 man-hours, was being conducted in the southwestern part of Fort Smith because a series of rapes had taken place in the area in late 1975 and early 1976. The crimes, as reported, fell into a pattern and identifying features given by victims were of considerable similarity. They described a white male, approximately 5'7" to 5'10" (or not over 6') tall, of medium build, 25 to 30 years of age, weighing 160 to 180 pounds, with short curly hair, and a noticeable body odor, who smelled strongly of cigarettes. A composite drawing of the suspect was made and released to the news media in early March. This drawing was published in a local newspaper. In response, the Fort Smith police department received a number of calls giving the names and addresses of possible suspects. A field investigator went out to locate and interview each such suspect. In all, 177 were interviewed. Of these, 55 were brought to the police department, interviewed and photographed. Only seven of these, one of which was appellant, were fingerprinted. Appellant's prints matched latent prints which had been taken at the dwelling of the victim in this case. The charge on which appellant was convicted was filed on the day the Fort Smith police department was advised by teletype message from the Federal Bureau of Investigation that comparison of the Loomis fingerprints with those taken at the scene of the crime here charged were "positive for identification."

The investigation of Loomis came about as a result of the

rape of a different victim that was reported at about 4:00 a.m. on March 23, 1976. Detective Sgt. Hatfield arrived at the scene at 4:19. Officer William Champion, in answering the call, stopped a motor vehicle driven by Loomis at high rate of speed approximately 11 blocks from the scene of this alleged rape. Champion stopped the vehicle and asked for the driver's license. Loomis told Champion he was going to Jenny Lind and Phoenix to meet his brother and take him to work at Southern Steel & Wire Company. Loomis was barefoot, and had a noticeable body odor, described by Champion as a "sweaty, unwashed" type body odor. Champion said that Loomis fit the description of the rapist given police. He noted two things to which he had been alerted in department briefings — Kool cigarettes in Loomis's car[1] and a lisp in his voice. When Loomis left, he went in the wrong direction for the mission he had indicated. Champion proceeded to the address of the reported rape without passing any other vehicles. He wrote up an interview report.

When Sgt. Hatfield learned of Champion's encounter with Loomis and Champion expressed the opinion that Loomis was a prime suspect in the incident that had occurred that morning, Hatfield and Officer Hammond went to the address Loomis had given, attempting to locate Loomis. Hatfield had learned from other officers that Loomis was staying at his mother's apartment there with a man named James Anderson, but overlooked the fact that one half of a pair of tweezers bearing the initials "J.A." had been found at the scene of one of the rapes.

When Hatfield and Hammond did not see the vehicle Loomis had been driving at the address he had given, they did not stop, but returned at 8:30 a.m., and, having then seen the vehicle there, went to the door and asked for Loomis. His mother had come to the door. She said that she would get him. When Loomis came to the door a few minutes later, Hatfield asked if he would mind coming to the police department and talking to the officers. Appellant agreed to do so, and, after he went back into the house to dress, was taken there in an unmarked police vehicle, without having been

---

[1] A police officer had found two fresh Kool cigarette butts outside the residence where the crime charged in this case was committed.

placed under any type of physical restraint, searched or even frisked.

He was taken into an interview room, advised of his rights, told that he was a suspect, and interviewed for 2½ hours. The officers said that Loomis was nervous, vague and evasive during this interview. Toward the end of this session, he was asked to submit to the taking of photographs and fingerprints. He consented and the prints then taken were forwarded to the FBI. Loomis was asked by Hatfield if he would take a polygraph test, who said he would "cut him loose if he passed it." Loomis had not previously requested an attorney, but at this point said that he did not want to take this test until he talked with an attorney. The officers then took Loomis to the public defender's office, and advised Mr. Graves, Deputy Public Defender, of the situation. After Loomis emerged from the office of Graves, where there had been a private consultation between him and Graves, Loomis told the officers that he had been advised to stay away from the polygraph if he was guilty but to take it if he was innocent. He agreed to return to the police department for this test at 2:00 p.m. and was taken home by Officer Hammond. Before Loomis was taken home, James Anderson, who had been waiting at the police department and who accompanied Loomis and the officers to the Loomis residence, was allowed to talk with Loomis. When Loomis did not appear for the polygraph test, the officers did not investigate until the following day, when they learned that Loomis "had packed up everything and left" after he returned from the police department.

None of the testimony of the officers was refuted. Loomis did not testify at the in camera hearing on the motions to suppress. The evidence in this case simply does not show the "investigatory seizure" or detention that characterized the *Davis* situation. Furthermore, even though the officers did not feel that they had probable cause to arrest Loomis at the time of the interview during which the fingerprints were taken, Loomis, unlike Davis, had become the primary focus of the investigation.

The police procedures in this instance were far different

from those employed in *Davis*. The only description the officers had of the rapist in that case was that he was a negro youth. The suspect there was only 14 years of age. The only reason for his being a suspect was the fact that he had occasionally been employed by the victim as a yard boy. He was exhibited to her on several occasions but she never identified him as her assailant. The state there not only conceded that the police had no probable cause for the detention of the accused, but never contended that the accused voluntarily accompanied the police to headquarters or willingly submitted to the taking of his fingerprints. The state only contended that the detention was during the investigatory, not the accusatory, stage and that probable cause is not required for detention for the sole purpose of taking fingerprints. Here, the testimony that Loomis voluntarily accompanied the police officers to the police department and voluntarily submitted to the taking of his fingerprints is uncontradicted. The reasons for police questioning of Loomis and being interested in taking his fingerprints at least approached probable cause for his arrest; but, at this stage, the police officers were properly acting cautiously and with admirable restraint. We find *Davis* wholly inapplicable.

When we view the totality of the circumstances surrounding the confession of Loomis, we cannot say that the finding of the circuit judge that it was voluntarily given was clearly against the preponderance of the evidence. Appellant contends that it resulted from his illegal detention on March 23, 1976, and that, when it was given, he was denied the assistance of counsel and was promised psychiatric help if he made a statement.

After the charge was filed and a warrant issued, Loomis was taken into custody in Hot Springs. Detective Sgt. Brooks was dispatched, along with Sgt. Roscoe Smith, to return Loomis to Fort Smith. As soon as Brooks saw Loomis, he advised Loomis of his constitutional rights and received an affirmative answer when he asked whether Loomis understood those rights. Loomis was advised of the crime with which he was charged and asked if he wanted an attorney. He did not request an attorney at that time. Loomis asked Brooks what kind of evidence they had against him, but Brooks told him they were not at liberty to explain that to him at the time.

The Fort Smith officers took custody of Loomis at 1:05 p.m. They arrived at the Fort Smith police department at approximately 3:30 p.m. During the trip from Hot Springs, Loomis was in handcuffs and leg irons. After the officers and Loomis got into the police automobile, he was again advised by Brooks of his rights. In addition, during the trip he was advised of his rights by Sgt. Smith, who specifically told Loomis that anything he said could and would be used against him. The officers did discuss the case with Loomis during the trip, but he wouldn't talk about it. They also asked questions about some of the offenses, but he would not discuss them, saying that he didn't want to talk about it. He would not answer any questions about anything and told the officers he wanted to talk to an attorney. He said he didn't think he'd better say anything without an attorney. He was told that the officers could get an attorney for him. Thereafter, the officers did talk to him about the case and did ask him some questions. No statements pertaining to any crime were made by Loomis and no evidence of an incriminating nature was obtained from him during this trip.

After arrival at Fort Smith, Sgt. Hartman took charge of the interrogation of Loomis. Neither Brooks nor Smith advised anyone that Loomis had said that he thought he had better talk to an attorney. Smith took a few minutes making out reports and then assisted Hartman in the interrogation. The first thing Hartman did was to explain to Loomis his constitutional rights, after which he handed Loomis a form on which these rights were explained. Loomis read it and signed a waiver of his rights. This waiver was on a printed form on which there was a concise but complete statement of waiver in bold capital letter type, which included the statement, "I DO NOT WANT A LAWYER AT THIS TIME." Otherwise, it was an acknowledgment by Loomis that he had read the annexed statement of his rights, that he understood what his rights were, that he was willing to make a statement and answer questions, that he knew what he was doing and that no promises or threats had been made to him and no pressure or coercion used against him. This was signed in the presence of Hartman and Smith.

The advice by Hartman to Loomis concerning his con-

stitutional rights started at 3:39 p.m. and ended at 3:43 p.m. There is no evidence to indicate that Loomis did not understand his constitutional rights or that his waiver was not freely, understandingly, knowingly and voluntarily given and executed. After some interrogation, during which Loomis was told about the FBI report on his fingerprints and the finding of a cigarette butt of the type of cigarette he smoked, no incriminating information was obtained from Loomis. He then stated that he would like to see either an attorney or the prosecuting attorney. He was asked if he would like for the officers to call the public defender, but he expressed a lack of confidence in this attorney. He had already indicated his inability to employ an attorney. The officers explained the difference between a defense lawyer and the prosecuting attorney. They said that, since it was approaching 5:30 p.m., the public defender had probably left his office, but they advised him that they could get a public defender and would try to reach a deputy public defender at his home. The officers again asked whether he wanted to apeak to a public defender and he said that the prosecuting attorney would be "okay."

According to Sgt. Smith, Ron Fields, a deputy prosecuting attorney, was called about 5:25 p.m., and arrived five to ten minutes thereafter. Fields thought the call came at about 4:00 p.m. Fields was introduced to Loomis and immediately explained his position, the duties of the prosecuting attorney and the difference between his position and a defense attorney's. Fields asked Loomis if he was certain he did not want an attorney present, gave him a synopsis of his rights and told him that, if he could not afford a lawyer, the court would appoint one, and that, even though the court had the power to appoint any member of the Sebastian County bar, it was probable that either the public defender or his deputy would be appointed. Fields said that Loomis was not eager to have the public defender appointed. Loomis stated that the prosecuting attorney's office had been real fair with him on a previous occasion. After Fields made certain that Loomis was fully aware of his rights and knew the difference between an attorney and the prosecuting attorney, Hartman again interrogated Loomis about the alleged offenses over a period of about 15 minutes, but every time anything that might tend to link him to the offense was mentioned, Loomis

stated that he was not ready to talk about the matter. There was some discussion about the fact that making a statement might make matters easier for him, or that he could be helping himself by making a statement. Loomis had asked Fields if he thought that Loomis needed an attorney and Fields thought he had told Loomis on each occasion that he would get a lawyer if Loomis wanted one, after which Loomis would drop the matter. Loomis had stated that he thought he might have a mental problem and was having difficulty facing the situation and that it might help if he admitted to himself, to Fields and to the officers exactly what had occurred. When Loomis said that he thought he might need mental treatment, Fields told him that the prosecuting attorney's office would do what they could to see that he was examined by competent medical authorities in the event he went to trial. He told Loomis that the prosecuting attorney's office would not oppose psychiatric help or his seeing a doctor, if this was what he wanted. No "deal" was made but it was indicated by Fields that Loomis could go to the State Hospital for examination.

Fields talked to Loomis three to four minutes in the absence of the police officers and then asked Hartman and Smith to return to the room when Fields indicated that he was willing to talk about the incident on which the charge in this case was based. Loomis made a statement or two relating to some details connected with this and another offense (where fingerprints had matched) and then stated, "I think I may need an attorney." At this time Fields arose to leave the room. When Loomis asked where he was going, Fields replied that he was going to get an attorney for Loomis. Loomis then told Fields to come on back, that he had something he thought Fields needed to hear. He then commenced admitting the offense of which he was convicted and that which occurred on the evening he was stopped by Officer Champion. Loomis then made a statement admitting several rapes. It was recorded on eight typewritten pages, was rather detailed, and contained revelations of facts not known to the general public. According to Sgt. Smith it was about 5:30 when Loomis called Fields back and commenced giving his statement. Fields left shortly thereafter, at some time between 5:30 and 6:30 p.m. Two or three breaks were taken during

the course of the statement which was concluded about 1:00 a.m. While it was still daylight, Sgts. Hartman and Smith and Loomis had gone to the different places where the offenses had taken place.

During the course of the interrogation, someone, probably Fields, had told Loomis it would make him feel better "to get this off your chest." Fields testified that he had said that this was strictly up to Loomis. Psychiatric treatment or examination had been a topic of conversation before Fields arrived, but Fields was not told this. Fields, in answering an inquiry by Loomis, told him that he ought to tell the truth, that Fields didn't think it could hurt him, and that being honest with himself could not hurt him. Fields said that at some time he had told Loomis that he would have to have an attorney before the matter was concluded.

There is no doubt about appellant's right to the assistance of counsel at the time he requested it. But it cannot be doubted that this right can be waived. See *Brewer v. Williams,* 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977). It would be absurd to say that Loomis was not fully aware of this right and his right to remain silent after the numerous occasions on which advice of these rights was given over a period of four or five hours and the repeated explanation of the difference in the functions of a prosecuting attorney and a defending one. There could hardly have been a more thorough waiver of that right than took place when Loomis recalled Fields from his attempt to obtain counsel for Loomis. There is not even a remote suggestion that this action was not both deliberate and voluntary. It is true that the state had the burden of showing that Loomis's relinquishment or abandonment of his known right to counsel was intentional [*Johnson v. Zerbst,* 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461, 146 ALR 357 (1938)]; but the only evidence before the trial court clearly indicated that it was. Even though he had previously expressed his desire for the assistance of counsel, there was nothing to prevent this adult, whose lack of intelligence is not suggested, from changing his mind. What stronger evidence could there be that the action of Loomis was intentional than his recalling the person who was undertaking to see that his known right to counsel was im-

plemented? Loomis did not say that it was not intentional. There is no evidence that this waiver was coerced. It would not be reasonable to say that his will was overborne at the very time his request was being honored. At the very least, the conclusion that the waiver was intentional and voluntary could fairly and reasonably be reached by the trial judge, and we are in no position to say that this finding was clearly against the preponderance of the evidence. To hold *any* statement taken after the accused invokes his right to counsel, or right to remain silent must be excluded from evidence under the rule of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 ALR 3d 974, as the product of compulsion would lead to absurd and unintended results. *Michigan* v. *Mosley,* 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). There is no other basis for excluding the confession of Loomis, which did not result from interrogation, but followed his own election to tell the officers of his guilt of the crime that his fingerprint so strongly indicated.

The judgment is affirmed.

GEORGE ROSE SMITH and BYRD, JJ., dissent.

CONLEY BYRD, Justice, dissenting. When I view the totality of the evidence surrounding the confession of Loomis — *i.e.* the numerous times that the officers violated the *Miranda rights* which they read to appellant by continuing to question him after he indicated he did not wish to talk and needed the services of an attorney — I cannot say that the State has sustained its burden of showing that it was voluntary.

For the reasons stated, I respectfully dissent.

GEORGE ROSE SMITH, J., joins in this dissent.