Adolphous SCOTT, Jr. *v.* STATE of Arkansas

CR 78-15                                           566 S.W. 2d 737

Opinion delivered June 12, 1978
(In Banc)

*Matthews & Sanders,* by: *Roy Gene Sanders,* for appellant.

*Bill Clinton,* Atty. Gen., by: *Jesse L. Kearney,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Adolphous Scott, Jr. was convicted of capital murder in the Hot Spring County Circuit Court for the killing of Henry Puckett. After a jury trial, Scott was sentenced to life imprisonment without parole. He raises ten allegations of error on appeal. We find merit in many of these points and reverse and remand the case.

Scott, who resided in Benton at the time of the killing, had been charged in June, 1973, with the first degree assault of V. O. McGuire. He was charged with shooting the store owner in Benton during the course of an argument. After a short period of time in jail, he was released on bond.

On July 31, 1973, Henry Puckett was killed during a robbery of his pawn shop. Scott was considered as a suspect in the killing. The law enforcement authorities had received information about a green Volkswagen, similar to Scott's, having been in the vicinity at the time of the killing. Scott was brought in for questioning, taken to Little Rock for a lie detector test and a trace metal examination, returned to Ben-

ton and released. Apparently there was insufficient evidence to justify holding Scott for the Puckett killing.

In September, 1973, McGuire died. The assault charge against Scott was changed to first degree murder. Scott was immediately arrested and his bond was revoked.

There was considerable unrest in the area about the McGuire death. There were also racial tensions in the community since both victims were white and Scott is black. Scott stated many times that he feared for his safety while in jail. On one occasion before his trial for the McGuire killing an unknown person was seen with a gun outside the jail in which Scott was being held.

The day before the trial for the McGuire killing, Scott was taken to the prosecuting attorney's office for questioning about the Puckett killing. The sheriff testified that Scott had initiated this meeting. Scott denied this and further stated that he had refused to talk to the prosecutor until his attorney had been called. The prosecutor did call Scott's attorney. When the attorney refused to give his permission to an interview, Scott was returned to his cell.

This first trial ended with a second degree murder conviction and a twenty-one year prison sentence for Scott. There were several outbursts during the trial. At least two people were arrested for disturbing the peace after the verdict was announced. Scott's lawyer left town within ten or fifteen minutes after the verdict was handed down.

Scott was returned to jail. He indicated that he was afraid for his life and was eager to be taken to the penitentiary as soon as possible. He testified that he expressed these fears to the sheriff, but was told that he was not going to the penitentiary until he confessed to the Puckett killing.

The day after Scott's first trial he wrote out a statement in longhand outlining the details of the Puckett killing. The essence of the statement was that Scott drove his car to the pawn shop under some duress, that someone else shot Puckett, and that Scott had no idea that Puckett was going to be killed. The statement also contained this curious phrase:

I have been read my rights and I understand that anything that I write in this statement can and will be held against me. *I also understand that this statement and testimonial is not valid without the presence of my attorney or the consent of his word.* [Emphasis added.]

The statement was not witnessed by any of the police officers present while Scott was writing it.

The sheriff and the other officers present at the jail as Scott was writing out this statement indicated that it was a totally voluntary act on Scott's part. In fact, the sheriff testified that he had no interest in Scott making a statement clearing up the Puckett killing. The statement was not delivered to the sheriff until after Scott arrived at the penitentiary later that same day — October 17, 1973.

There was little evidence gathered after October 17, 1973, implicating Scott in the Puckett killing. The prosecuting attorney did allude to some investigation the summer before trial when depositions were taken in Michigan from Scott's alleged accomplice. In any event, no charges were filed against Scott until July 1, 1976 — almost three years later. Scott's attorney filed a motion to dismiss the charges because of delay. During argument on this motion the state failed to offer any real reason for the delay.

Scott claims that the delay prevented him from using two alibi witnesses, and therefore that he suffered irreparable prejudice. One of those witnesses was Scott's former wife. Scott argued that if his wife had been present at trial she would have testified about his alibi. He stated that he had not seen his wife since about a year after his imprisonment and that he did not know her whereabouts. He said that she had divorced him. Scott proffered evidence that a friend of his, with whom he claimed he was playing basketball at the time of the Puckett killing, had died a year and a half after the killing. The state stipulated that if the two witnesses were present they would testify as Scott's attorney represented.

Apparently the court and the prosecutor assumed that because there is no statute of limitations for murder, charges

can be filed at any time. See Ark. Stat. Ann. § 41-104(1) (Repl. 1977). The state did not really respond to the motion to dismiss. If it cannot be shown that the state had good cause for its delay in filing the charges against Scott, then the charges should be dismissed. We cannot say from the record that the state does not have evidence that the matter was being investigated during this three-year gap. A new sheriff and prosecuting attorney were in office at the time these charges against Scott were filed. We cannot tell from the record if the former sheriff and prosecutor pursued this matter after receiving Scott's confession. Therefore, the state will be given an opportunity to explain the delay.

Just because the statute of limitations does not run on a murder charge does not mean that a person can be brought to trial at any time. The prosecution cannot delay simply for the purpose of gaining a tactical advantage over the accused. The United States Supreme Court has noted that there may be circumstances where prejudice occurs from prosecutorial delay which require the dismissal of charges. *United States* v. *Lovasco,* 431 U.S. 783, 97 S. Ct. 2004, 52 L. Ed. 2d 752 (1977), reh. den. 434 U.S. 81. Since Scott was able to show prejudice to his defense, unless the state can come forward with a satisfactory reason for the delay, the charges should be dismissed.

Scott also argues that the case should have been dismissed because of failure to bring him before a judicial officer without unnecessary delay. We have mentioned that charges were not filed against Scott until almost three years after the offense occurred. The prison authorities received the service of process and attached it to Scott's file. However, there is no evidence that Scott was personally served with a copy of the warrant. He was not arraigned until April 19, 1977. Counsel had been appointed for him on December 1, 1976; however, from the time the charges were filed until the trial, three different lawyers had been appointed to represent Scott.

In view of the fact that Scott was in the penitentiary at the time the charges were filed, and that one continuance was at the request of defense counsel, we cannot say that the charges should be dismissed because of failure to bring him before a judicial officer as required by Rule 8.1, Rules of

Criminal Procedure (Repl. 1977). However, the fact that Scott was not promptly brought before a judicial officer and arraigned lends weight to Scott's motion to dismiss the charges because of delay, and necessarily enters into our judgment requiring the state to offer a satisfactory explanation.

We hold that Scott's statement was clearly not intended to be used against him in court. He stated that he understood the statement was invalid unless his attorney consented to its being given to the law enforcement authorities. No such consent was shown. Since Scott made this statement while in custody, the state has the burden of proving that it was voluntarily made. *Harris* v. *State,* 244 Ark. 314, 425 S.W. 2d 293 (1968).

The evidence offered by the state consisted of statements by the law enforcement officers that Scott simply wanted to get this matter off his conscience and asked for paper to write out a statement. It is peculiar that no officer witnessed the statement. It is also peculiar that the statement was not delivered to the sheriff until Scott was taken to the penitentiary. This is particularly true in light of Scott's assertion that he feared for his life in jail, but was told he would not be taken to the prison unless he confessed. Scott was obviously under considerable pressure. We have already mentioned the incident in the prosecutor's office before the McGuire trial, and the unknown assailant outside Scott's jail cell. There was a great deal of unrest in the community. When we consider the totality of the circumstances, we must conclude that Scott's statement was involuntary and should have been suppressed. *Loomis* v. *State,* 261 Ark. 803, 551 S.W. 2d 546 (1977).

Scott also argues that the prosecuting attorney persisted in attempting to place the results of Scott's polygraph examination before the jury. Whether this was reversible error, or warranted the drastic remedy of mistrial is a close question. Scott's attorney, during an outline of the events that led to trial, mentioned in opening statement that Scott had taken a polygraph test the day he was first arrested but released for the Puckett killing. The prosecutor obviously wanted to get the results of that test before the jury. The matter came up

during the direct examination of a state rebuttal witness when the prosecutor attempted to ask the witness for the results of the test.

The court had previously ruled in chambers that the witness could be asked if Scott had taken the polygraph, but that the results could not be disclosed. Scott's counsel had asked the court to rule that the witness could not be asked any question about the test. The court denied this request, but specifically ruled that the results of the test were not admissible on direct examination. The court then denied in chambers a request that Scott's counsel not be required to make his objections in front of the jury; in open court, the trial court also denied Scott's counsel's request for a continuing objection, as opposed to objecting after each question.

The prosecutor then asked the witness about the results of the polygraph examination. Scott's counsel objected and was granted an in-chambers hearing on the question. However, before going in chambers the prosecutor, in the presence of the jury, asked:

MR. COLE: Your Honor, I didn't hear the objection. Is the Court not allowing me to go into the results?

THE COURT: No, sir, not at this time.

Scott's attorney then moved for mistrial. The motion was denied, and the prosecutor passed the witness. No admonition was requested, nor was one given to the jury.

Scott's argument on appeal is that the trial court should have granted his motion for mistrial since the prosecuting attorney purposely asked about the results of the polygraph test despite the trial court's specific ruling to not mention the results. We find no prejudicial error in this situation. Defense counsel first raised the issue during opening statement. This raised an inference that Scott's test results were favorable. While the prosecutor's action raised a negative inference, the actual results of the test were never before the jury. Scott may have been entitled to an admonition that the jury not con-

sider the evidence, but since none was requested we find no error in the trial court's failure to admonish the jury. See *Gammel & Spann* v. *State,* 259 Ark. 96, 531 S.W. 2d 474 (1976). While the prosecutor's actions may have warranted an admonition by the trial court, we cannot say that the drastic remedy of mistrial was required.

The trial court committed error in asserting a non-existent husband-wife privilege for a prosecuting witness. One of the deputy sheriffs had testified that he never intimidated prisoners into signing confessions. His former wife was later called as a witness and, according to a proffer of evidence, would have testified that the deputy sheriff used to boast of intimidating prisoners. The trial court, on its own motion, invoked the husband-wife privilege on behalf of the deputy sheriff. Such a privilege can only be exercised by a defendant in a criminal case. Rule 504(c), Ark. Stat. Ann. § 28-1001 (Supp. 1977).

The court also committed error when it allowed the state to have read into evidence a "Firearm Transaction Record" that had been taken from Puckett's store. The document had not been properly authenticated by the police officer who testified about it. In an apparent effort to cure the authentication problem, the court allowed the witness to read the document rather than present it to the jury.

This document would have been admissible as a business record if it had been made available to the defendant according to the rules of evidence. Rule 803 (6), Ark. Stat. Ann. § 28-1001 (Supp. 1977). Since the defendant had not had the opportunity to see it before trial, and since it had not otherwise been properly identified, we hold that it was reversible error to allow its contents to be read to the jury.

The trial court also erroneously permitted testimony by a witness about an out-of-court identification of Scott's Volkswagen. As previously mentioned, several witnesses identified a green Volkswagen in the vicinity of Puckett's store at the time of the killing. Later Scott's vehicle was illegally seized by the police and impounded. The trial court

allowed a witness to testify the illegally impounded vehicle was the one she had seen near Puckett's pawn shop on the day of the killing. Permitting this testimony was clearly erroneous. See *Freeman* v. *State,* 258 Ark. 617, 527 S.W. 2d 909 (1975).

Several other allegations of error were made by Scott. However, we find no merit to any of these.

This case is reversed and remanded for proceedings not inconsistent with this opinion.

Reversed and remanded.

GEORGE ROSE SMITH, FOGLEMAN and BYRD, JJ., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I dissent only from the remand of this case. As pointed out in the majority opinion, the state failed to file any response to appellant's motion to dismiss. The state had an opportunity, by a response, to state the reason for the delay. Furthermore, the state did not offer one word of testimony or any oral explanation for this unusual lapse of time before charges were filed. Appellant's guns were not masked. His position was clearly stated by his motion and by the stipulated evidence. If other questions had not been raised on appeal, this court would not have been justified in giving the state an opportunity to file a belated response or make a belated showing of good reasons for the delay in filing charges. There was nothing speculative or premature in appellant's due process claim. The testimony of the unavailable witness was not cumulative, so prejudice was clearly established. Although I do not consider the dimmed memories of other witnesses controlling on the question, this condition was obvious.

If the state had reasons, the prosecuting attorney must have been well aware of them. It is not reasonable to assume that the prosecuting attorney filed these charges after the prolonged delay, without being aware of the reason for delay. It is reasonable to believe that he would have presented them, if they justified the delay. Instead, the prosecuting attorney stood mute, except for the stipulation entered into. Not a

word of testimony or a bit of evidence was introduced at the trial that was not available to the state at the time of appellant's involuntary confession. Although I do not disagree with the majority opinion on the other points for reversal, I would never reach them, because I would reverse and dismiss on the ground that the trial court erred in denying appellant's motion to dismiss because of the delay in filing charges.

I am authorized to state that Mr. Justice GEORGE ROSE SMITH and Mr. Justice BYRD join in this opinion.