Samuel Davis DUNCAN *v.* STATE of Arkansas

CR 85-228                                               726 S.W.2d 653

Supreme Court of Arkansas
Opinion delivered March 23, 1987

524

*Achor & Rosenzweig,* by: *Jeff Rosenzweig,* for appellant.

*Steve Clark,* Att'y Gen., by: *Mary Beth Sudduth,* Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. While investigating a disturbance on March 4, 1985, Pine Bluff police officer John Fallis was shot and killed. The next day Samuel Davis Duncan was arrested and charged with the murder of Officer Fallis. Duncan was found guilty of capital felony murder and sentenced to death by lethal injection. He raises numerous points on appeal, two of which require reversal.

### The Confession

Duncan insists his confession should have been suppressed. The testimony is sharply disputed—Duncan maintains he was physically abused by the interrogating officers and they deny such mistreatment, while conceding some verbal abuse. Duncan claims he was struck in the stomach by one of the officers with such force that he urinated on himself, that he was denied access

to a lawyer or a telephone and was repeatedly threatened.

Some of the principles by which we are guided in attempting to resolve these conflicts are: the burden is on the state to show the statement was made voluntarily, freely, and knowingly, without hope of reward or fear of punishment [*Tatum* v. *State*, 266 Ark. 506, 585 S.W.2d 957 (1979)]; when reviewing the admissibility of a confession on appeal, we make an independent determination of the voluntariness of the confession based on the totality of the circumstances, and the trial court's decision will not be reversed unless it is clearly against the preponderance of the evidence [*Stone* v. *State*, 290 Ark. 204 (1986)]; *Fleming* v. *State*, 284 Ark. 307, 681 S.W.2d 390 (1984); a confession based on threats of harm is inadmissible [*Davis* v. *State*, 275 Ark. 264, 630 S.W.2d 1 (1982)]; conflicts in the testimony are for the trial court to resolve as it is in a superior position to determine the credibility of the witnesses [*Stone* v. *State, supra.*]

A chronology of the less disputed events surrounding Duncan's confession begins at about noon on the day after the shooting. Duncan was arrested at his residence in Grady, Arkansas and taken to the Pine Bluff police station. Shortly thereafter and prior to any interrogation, the prosecuting attorney, Wayne Matthews, filed a felony murder information against Duncan. In mid-afternoon the police began their interrogation of Duncan. Present during this interview were two Pine Bluff police officers, the prosecuting attorney, and a deputy prosecuting attorney. No careful inquiry into Duncan's reading and comprehension proficiency was made. While Duncan testified he dropped out of school at the eleventh grade, a psychologist testified at the suppression hearing that he read at a third grade level and had an IQ of 70 which he classified as being mildly retarded.

Duncan's rights were read to him and after he was told he had a right to have an attorney present before making any statement, he asked, "Do ya'll appoint lawyers?" The officer did not answer the question directly but continued reading the Miranda rights form.

There is no evidence in the record of any rights waiver form being signed, nor was Duncan asked at any time whether in addition to understanding his rights he also agreed to waive them. Duncan did sign the rights form, misspelling his name in the

process (D-U-N-A-N).

The officers proceeded with the interrogation of Duncan for approximately two and one-half hours, failing to get anything but exculpatory information from him. He was taken to his cell and kept there until late Friday night when he was returned to an interrogation room. He was not allowed to make any phone calls during this three and a half day period. Late Friday night he was again interrogated and at this time gave incriminating information, admitting he had shot the officer.

The next day, Saturday, Duncan was allowed to see his girlfriend, also in custody, for a brief period, but was allowed no other visitors or phone calls. On Sunday, the officers asked appellant to give his confession again, and this time it was video-taped. The court found both the Friday and Sunday confession admissible, but only the Sunday confession was introduced at trial.

While Duncan makes a number of objections with regard to the confessions that are not supported by the record, there are two points which warrant reversal—the lack of an effective waiver of rights and failure to bring appellant before a magistrate for a prompt first appearance pursuant to A.R.Cr.P. Rule 8.1.

### Unnecessary Delay

Rule 8.1 states simply:

> An arrested person who is not released by citation or by other lawful manner shall be taken before a judicial officer without unnecessary delay.

There is no guidance from the rule or the Commentary as to what constitutes an "unnecessary delay" or what effect a violation of the rule will have on evidence obtained during such a delay. Nor have our cases necessitated establishing guidelines on these issues. See, Notes, *Richardson* v. *State*: A.R.Cr.P. Rule 8.1, A Rule in Need of a Standard, 38 Ark. L. Rev. 842 (1985).

Federal cases are governed by the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. § 3501, which provides that a voluntary confession will not be inadmissible solely because of delay in bringing a person before a magistrate "if such confession was made or given by such person within six hours

immediately following his arrest or other detention." Similarly, the National Advisory Commission on Criminal Justice, has recommended a maximum time limit of six hours, Nat. Adv. Comm. on Crim. Justice, Corrections, § 4.5, (1973) and the Model Code of Pre-Arraignment Procedure, § 130.2 (1975) allows the accused to be held for two hours and under certain circumstances an additional three hours for a total period not to exceed five hours. While most states have avoided a categorical time limit, some have not, and there is a consistent concern when confessions are obtained after an accused is held beyond a twenty-four hour period. See 28 A.L.R. 4th 1121, Delay in Arraignment; Am. Jur. 2d *Evidence* § 547 (Supp. 1985) (and cases cited therein). The Pennsylvania Supreme Court, pursuant to its supervisory power, adopted a six hour limit and noted that in none of its many cases had a delay of six hours or more been found to be a necessary delay. *Commonwealth* v. *Davenport*, 370 A.2d 301 (S.Ct. Pa. 1977).

We will not here decide whether a specific time limit should be applied, as it is clear the delay of three and one-half days was unnecessary. There is no evidence in the record to suggest a reason for the delay in taking the defendant before a judicial officer in accordance with Rule 8.1, nor does the state offer any explanation in its brief. In fact, the record shows the delay was purposeful and that the prosecutor made a deliberate decision to hold Duncan in detention and ignore the prompt appearance requirement. We find no justification for the delay in complying with Rule 8.1.

## Effect of an Unnecessary Delay

The other question to be dealt with is—where there has been an unnecessary delay under Rule 8.1, what impact does it have on evidence obtained during the interval. In resolving the issue we explore the reasons behind the prompt appearance requirement, originally developed by the U.S. Supreme Court and referred to as the *McNabb-Mallory* rule. See, LaFave, supra, § 6.3(a). LaFave notes that of greatest significance is the notion that the rule is "intimately related to the problem of eliminating the third degree since the use of coercion to obtain confessions most frequently occurs while the accused is being held in violation of prompt appearance statutes." Id. at 455. LaFave continues

quoting another commentator:

> Since "the use of third-degree tactics is . . . difficult to prove because there is always the word of the police against the word of the accused; and the prestige of police testimony usually carries the day," the safeguards upon which the traditional confessions rules rest have aptly been called "illusory." The main thrust of the *McNabb-Mallory* rule . . . is to bypass conflicts over the nature of the secret interrogation and to minimize both the "temptation" and the "opportunity" to obtain coerced confessions. *Id.* at 455, citing, Y. Kamisar, Police Interrogation and Confessions, (1980).

It has been recognized that in addition to the purpose of guarding against the coercive influence of custodial interrogation, the rule insures that the accused is placed in early contact with a judicial officer so that protections covered by preliminary arraignment are afforded without delay, that the right to counsel may be clearly explained and implemented upon the accused's request and that the accused is protected from being held incommunicado for protracted periods of time. *Commonwealth v. Davenport, supra; People v. Heintze*, 614 P.2d 367 (1980); *State v. Benbo, ___ Mont. ___,* 570 P.2d 894 (1977); Model Code of Pre-arraignment Procedure § 150.2 Commentary at 388 (1975).

With these considerations in mind, the Supreme Court in *McNabb v. United States*, 318 U.S. 332 (1943) held that statements taken during a delay prior to a first appearance should be excluded. The Court found the conviction

> cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law. Congress has not explicitly forbidden the use of evidence so procured. But to permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law.

See also, Kamisar, supra at 9-13. Generally, exclusion of the confession has continued to be the result of a violation of the prompt appearance rule. See 28 A.L.R. 4th 1121, *supra*; LaFave, *supra*, § 6.3.

The significant question respecting the exclusion of these statements is whether there should be automatic exclusion or whether there should be a further consideration of prejudice or causal connection. We have not addressed this point directly, but have suggested there should not be a per se exclusion, that it should depend on a causal relationship between the delay and the statement. *Richardson,* 283 Ark. 91, 678 S.W.2d 772 (1984). (Evidence taken prior to the delay was "not tainted by what came afterward.") The causal requirement appears to be the majority rule and as we are in agreement, we affirm the position taken in *Richardson, supra.* See 28 A.L.R. 4th 1121, *supra.*

The state urges the confession was voluntary under the totality of the circumstances, but we do not regard that approach as appropriate in seeking a reasonable and fair resolution of the application of this rule. As we have said, assurance of voluntariness is not the only concern. Of equal importance is the mechanism of the first appearance that guarantees that the accused's constitutional rights will be protected and implemented. "Indeed, [the rights afforded under Rule 8.1] are basic and fundamental rights which our state and federal constitutions secure to every arrestee." *Bolden* v. *State,* 262 Ark. 718, 561 S.W.2d 281 (1978). Furthermore, if exclusion under the rule rests on a voluntariness standard, we are again faced with a swearing-match the rule was designed to avoid. As was stated well in *State* v. *Benbo, supra*:

> Under [the voluntariness standard] the statutory requirement of an initial appearance without unnecessary delay after an arrest is practically meaningless. Only when a defendant can affirmatively show statements, admissions, or confessions attributed to him were either not made at all, or were involuntarily made, would the failure to provide him with a prompt initial appearance be taken into account. This would put an almost impossible burden on a defendant. Furthermore, there would be no incentive for arresting officers to conform their procedures to statutory requirements.

As opposed to a voluntariness standard, we think the sounder approach is found in the three-part test used in Pennsylvania: 1) the delay must be unnecessary; 2) the evidence must be prejudicial; 3) *the evidence must be reasonably related to the*

*delay. Commonwealth* v. *Davenport, supra; People* v. *Heintze, supra; State* v. *Benbo, supra*; see generally, 28 A.L.R. 4th 1121, *supra,* § 4, § 5.

Here it is evident the delay was unnecessary and the incriminating statements were unquestionably prejudicial. We also find the statements were causally related to the delay. We would not require that the delay be the sole cause of the confession, for this would revive the problems found in applying a voluntary standard. See also, *Commonwealth* v. *Barilak*, 460 Pa. 449, 333 A.2d 859 (1975). It is sufficient if it reasonably appears the delay contributed to obtaining the confession. Here, when Duncan was first questioned for two and a half hours, he gave nothing but exculpatory statements. It was only after three and a half days of incommunicado detention that he incriminated himself. We conclude the statements were reasonably related to the delay, in violation of the rule. See *Commonwealth* v. *Davenport, supra; State* v. *Benbo, supra.*

### Absence of Waiver

While the confession must be excluded on the basis of the Rule 8 violation, the lack of an effective waiver of counsel is also significant.

Fifth amendment *Miranda* rights can be impliedly waived by conduct, depending on the facts of the case. If the rights are explained and the accused, having understood those rights, proceeds to give inculpatory statements, an argument can be made for waiver. LaFave, *supra,* § 6.9, p. 530-31. We have recognized such a waiver in *Fleming* v. *State*, 284 Ark. 307, 681 S.W.2d 390 (1984). The complicating factor here is when the information was filed Duncan's sixth amendment right to counsel attached, and this occurred prior to any interrogation. LaFave, *supra,* § 6.4, p. 466, *Brewer* v. *Williams*, 430 U.S. 387 (1977); *Loomis* v. *State*, 261 Ark. 803 (1977). LaFave states:

> The [*Brewer* v. *Williams*] court declared the 'right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, information, or

arraignment.'

See also, *Michigan* v. *Jackson*, ___ U.S. ___ (No. 84-1531, decided April 1, 1986); *Kirby* v. *Illinois*, 406 U.S. 682 (1972).

The state concedes Duncan's sixth amendment right to counsel had attached but argues there was an implied waiver. The right to counsel under the sixth amendment can be waived, *Brewer* v. *Williams, supra,* however there is no settled agreement as to what constitutes an effective sixth amendment waiver of counsel. It was noted in *State* v. *Wyer,* 320 S.E.2d 92 (W.Va. 1982), that the United States Supreme Court had not yet indicated whether a waiver of *Miranda* rights would effectively waive sixth amendment right to counsel, although *Wyer* quotes language in several Supreme Court cases pointedly suggesting that a higher standard is required for waiver of the sixth amendment right to counsel. *Wyer* also notes that jurisdictions range from finding an express *Miranda* waiver sufficient [*State* v. *Burbine,* 451 A.2d 22 (R.I. 1982)], to the requirement that once the sixth amendment right has attached "a valid waiver . . . to have counsel present during post-indictment interrogation must be preceded by a federal judicial officer's explanation of the content and significance of this right." *United States* v. *Mohair,* 624 F.2d 1140 (2nd Cir. 1980).

Here there was no express or written waiver, and if Duncan's confession is to be upheld it must be on the basis of an implied waiver of his *Miranda* rights. We do not find a sufficient waiver of the sixth amendment right to counsel in this case. In *Loomis, supra,* we dealt with a post-indictment custodial interrogation. We recognized that sixth amendment right to counsel had attached and required the state to show the defendant intentionally relinquished his right to counsel and did so deliberately and voluntarily. *Johnson* v. *Zerbst,* 304 U.S. 458 (1938). We found the waiver in *Loomis* effective. Loomis had signed an express waiver of his right to counsel which included the statement in boldface type, "I DO NOT WANT A LAWYER AT THIS TIME." Additionally, there were specific statements by the defendant that clearly demonstrated he was waiving his right to counsel and that he was fully aware of the consequences.

In contrast, Duncan was barely literate and marginally retarded. He was not given a waiver form to sign nor was he

asked whether he waived his rights; he was kept incommunicado for three and a half days, and it was only at the end of that time that he gave an inculpatory statement. There was no showing of a deliberate and intentional relinquishment of his rights, or that he had a clear understanding of what those rights were.

*Issues on Remand*

## II

The remaining points for reversal are discussed for purposes of remand.

### *Disqualification of the Prosecuting Attorney*

Duncan argues that the prosecutor, Wayne Matthews, and members of his staff should have been disqualified and a special prosecutor appointed. While Duncan disclaims any inference of unethical conduct by Matthews, he urges that his active participation in the interrogation, and the possibility of his being called as a witness by the state or the defense, encroaches on the rule that an attorney shall not serve as both an advocate and a witness in the same case. The trial court refused to order disqualification, but did rule that Matthews could not be called by the state at trial. Matthews did testify at the suppression hearing and was called by the defense to testify in the penalty phase of the trial on unrelated issues.

We do not agree with appellant that the office of the prosecuting attorney should have been disqualified per se. See *Ford* v. *State*, 4 Ark. App. 135, 628 S.W.2d 340 (1982). We do agree that when a prosecutor undertakes an active role in the investigation of a crime to the extent that he becomes potentially a material witness for either the state or the defense he can no longer serve as an advocate for the state in that case. *Enzor* v. *State*, 262 Ark. 545, 599 S.W.2d 148 (1977); *Bowling* v. *Gibson*, 266 Ark. 310, 584 S.W.2d 14 (1979). The developments at this trial illustrate the necessity of such a rule: the prosecutor in Duncan's trial not only testified at the suppression hearing in support of interrogation procedures but in argument to the jury he described the events during Duncan's confinement and expressed his opinion as to a crucial element of the case. We quote:

[Duncan] stated that he was in isolation and these surrep-

titious or secret meetings with Mr. Cook. Nicole Smith, his girlfriend, visited him twice. They were allowed to visit each other Friday when he gave his statement. They were allowed to visit Sunday when he gave his statement. So he saw the only relative that we know of he had, outside of the people of Grady, two of whom are witnesses against him. And they were allowed to visit. He wasn't shut off and isolated. (T. 1628-T. 1629).

In so doing, the prosecutor effectively became a witness for the state and underwrote his own credibility. A prosecutor should never cast himself in the role of a prosecutor and a witness and it was reversible error to do so.

### Other Homicides as Aggravating Circumstances

Duncan maintains it was error to permit the prosecuting attorney to use evidence of two homicides in Washington as aggravating circumstances under Ark. Stat. Ann. § 41-1303(3)(Repl. 1977). Duncan had announced in open court that he would waive extradition to Washington to be tried on charges pending against him for the murders of Barbara Currier and William Hartley. The prosecutor refused to relinquish custody of Duncan and the trial court declined to order it. Duncan argues that he was thereby deprived of the opportunity to vindicate himself of those charges so that they could not be used against him. He contends the statute is unconstitutional on its face or at least as applied.

We need not settle the issue, admittedly a troubling one where the defendant's guilt is still undetermined, because appellant's brief tells us parenthetically that Duncan is now in Washington awaiting trial on the pending charges.

### Peremptory Challenges

Duncan exhausted his peremptory challenges and complied with requirements of *Conley* v. *State*, 270 Ark. 886, 607 S.W.2d 328 (1980) and *Singleton* v. *State*, 274 Ark. 126, 623 S.W.2d 180 (1981) and charges error in the trial court's refusal to excuse some six jurors whose responses to questions on the death penalty were equivocal. We need not recount the answers, the trial court's discretion in these matters was not abused. *Linell* v.

*State*, 283 Ark. 162, 671 S.W.2d 741 (1984).

### Biased Juror

█ The trial court denied a motion by the defense to excuse one juror for cause after the defense was bereft of peremptory challenges. The juror was a member of the Jefferson County Sheriff's Mounted Patrol. He had held that status for fourteen years. He testified he was paid for such services, but Wayne Matthews in a bench conference, denied the juror was paid. While there is no evidence of actual bias, we have stressed the need for some liberality in excusing prospective jurors for cause where there are ties to either side which might affect the juror's impartiality. *Roderick* v. *State*, 288 Ark. 360, 705 S.W.2d 433 (1986).

### Death-Qualified Juries

Another assertion of error concerns death-qualified juries, approved in *Lockhart* v. *McCree*, ___ U.S. ___, 106 S.Ct. 1758 (1986). The sole purpose of the argument is to preserve the point for the future and we need not address it.

### Mistrial Motions

#### A.

█ In opening argument the prosecutor told the jury that John Fallis was 26 years of age, was recently married, had a child by a former marriage, and had been a police officer for two years and four months. A defense mistrial motion was denied. No abuse of the trial court's discretion occurred. *Combs* v. *State*, 270 Ark. 496, 606 S.W.2d 61 (1980).

#### B.

█ When the state was unsuccessful in introducing an exhibit over the objection of the defense, the prosecutor commented, "Let the record reflect that the state offered this as Exhibit 21." Duncan argues on the strength of *Timmons* v. *State*, 286 Ark. 42, 688 S.W.2d 944 (1985) that the comments constitute reversible error mandating a mistrial. We disagree. The incident was not comparable to what occurred in *Timmons*, where it was determined that the state called a witness to the stand knowing the proffered proof was inadmissible and then

argued to the jury that the defense had prevented the evidence from being heard.

### Washington Arrest Warrant

Over a defense hearsay objection the trial court admitted the front page of a warrant for Duncan's arrest issued by the State of Washington in connection with the deaths of Barbara Currier and William Hartley. The warrant was offered as evidence that Duncan shot Officer Fallis in order to avoid arrest on the murder charges—an aggravating circumstance. Officer James Yoshida had already testified without objection that a warrant had been issued for Duncan's arrest and the document itself added nothing. For the reasons already noted, the issue should not again rise.

### Death Sentence Motivated by Passion or Prejudice

Because the jury found no mitigating circumstances, Duncan argues its rejection of testimony from his mother and sister that he had saved lives means the verdict was the result of passion or prejudice. We reject the argument. The jury may have discounted the testimony of Duncan's wife and sister, or, while accepting its accuracy, have found it immaterial without manifesting passion or prejudice.

### Arkansas Statutory Scheme

Another argument is that the Arkansas statutes require imposition of the death penalty if the jury finds aggravating circumstances outweigh mitigating circumstances. We have answered that contention by pointing out that irrespective of the jury's findings as to aggravating versus mitigating circumstances, it can still return a verdict of life without parole, simply by rejecting the death penalty. *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 233 (1986); *Clines, et al.* v. *State*, 280 Ark. 77, 656 S.W.2d 684 (1984).

### Other Rulings by the Trial Court

Several evidentiary and procedural rulings over defense objections may be presented at retrial: photographs of the body of one of the Washington murder victims were introduced over the objection of the defense in the penalty phase. The victim,

Barbara Currier, is pictured in a sitting position with her slacks pulled down around her knees. There is nothing notably inflammatory about the scene. Their admission was within the trial court's discretion. *Sumlin* v. *State*, 266 Ark. 709, 587 S.W.2d 571 (1979).

Shells of the same manufacture as those fired from the murder weapon were received in evidence in the guilt phase. We find no abuse of the trial court's discretion. *Shelton* v. *State*, 287 Ark. 322, 699 S.W.2d 728 (1985).

Duncan objects to the state being allowed to close the argument in the penalty phase. As it had the burden of proof, it had the right to close. *Collins* v. *State*, 259 Ark. 8, 531 S.W.2d 13 (1975).

During the penalty phase the defense proposed to offer hearsay evidence that the father of Barbara Currier believed his daughter and William Hartley were involved in drugs, that Barbara was "a tough girl who would have fought like hell" to defend Hartley from an attacker. The defense asked the court to admit that proof without opening the door to proof by the state regarding Duncan's character. Since the nature of the opposing proof is not disclosed, we cannot say it would be error to admit such proof at retrial. However, this issue should be mooted by the Washington proceedings.

Neither the trial court's refusal to sequester the jury nor its restriction on extended voir dire constituted an abuse of discretion. *Rector* v. *State*, 280 Ark. 385, 655 S.W.2d 168 (1983); *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982).

### Cruel and Unusual Punishment

The argument that the death penalty is cruel and unusual punishment in violation of the eighth amendment has been rejected by the United States Supreme Court, *Gregg* v. *Georgia*, 428 U.S. 153 (1976) and by this Court. *Fairchild* v. *State*, 284 Ark. 289, 681 S.W.2d 380 (1984).

For the reasons stated, the judgment is reversed and the case is remanded.

PURTLE, J., concurs.

JOHN I. PURTLE, Justice, concurring. I concur in the result reached by the majority. However, I feel compelled to set out additional facts which I think constituted error. Before stating these additional facts, I believe the appellant was held incommunicado from Wednesday through Sunday and, in all probability, much longer. I agree with the majority that three and one-half days is too long to be so held.

I agree that the same evidence relating to the alleged homicides in Washington will not likely be introduced at the second trial. However, there is the possibility that such matters may still be pending in the Washington courts when this case is retried. Therefore, I would hold that the evidence that was presented at the trial below would be reversible error if it were to be introduced again.

There is a second point which I think probably will not reoccur, but it should be guarded against. A member of the Sheriffs' Mounted Patrol, whether paid or not, is still an officer and should be rejected for cause from serving as a juror. In most cases there are hundreds of prospective jurors around. I see no need to invite error where it can be avoided.

The third point I wish to comment on is the state's attempt to offer Exhibit # 21 into evidence after having been instructed not to do so. Although such action is subject to immediate treatment and cure by the trial court, it is nevertheless error to allow the state to bring this evidence to the jury's attention as was done in this case.

Finally, I think the trial court erroneously admitted the front page of the arrest warrant for Duncan which had been issued by the state of Washington. This information is so highly unreliable and serves no purpose other than to influence and inflame the jury; therefore, its introduction could result in prejudicial error.