**STATE of Maine**

v.

**William STONE, Jr.**

Supreme Judicial Court of Maine.

Feb. 20, 1979.

Richard S. Cohen, Deputy Atty. Gen., Michael D. Seitzinger (orally), Charles K. Leadbetter, Fernand LaRochelle, Asst. Attys. Gen., Augusta, for plaintiff.

Lawrence J. Zuckerman, Gray (orally), Donald L. Carter, Jr., Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

DELAHANTY, Justice.

The defendant was convicted of second degree homicide [1] after a jury trial held in Superior Court, Cumberland County. [2] The questions presented on this appeal arise from the admission at that trial of an incriminating statement made by the defendant while in police custody. We are urged to hold that the admission of the statement violated the defendant's fifth and sixth amendment rights under the Constitution of the United States.

After a careful review of the record, we find no error in the presiding Justice's decision, entered after a lengthy suppression hearing, to admit the statement. Accordingly, we deny the appeal.

## FACTS

At approximately 11:00 a. m. on December 8, 1976, the defendant was arrested in his Portland apartment by police officers in connection with the murder on the previous day of a South Portland woman, Catherine Heagerty. [3] Two hours later, the defendant was taken to the Portland Police Department in a police cruiser. Sitting next to him in the back seat of the cruiser was Sergeant Greeley of the Maine State Police. Lieutenant Lamontagne of the Maine State Police and Sergeant Libby of the South Portland Police Department occupied the front seat. After reading the defendant his *Miranda* rights, [4] Greeley asked the defendant if he wished to talk about the crime. According to Greeley, the officer closest to Stone, the defendant simply answered in the negative. Sergeant Libby, however, testified that the defendant stated: "I think I would like to talk to an attorney." In any event, no further conversation between the defendant and the officers took place in the cruiser or for some time thereafter.

The defendant was booked at the Portland police station, held for two hours, taken to the South Portland police station and booked, for the second time, at about 3:00 p. m. Shortly before six o'clock that evening, the defendant's wife, Elsie Stone, came to the station asking to see her husband. Mrs. Stone was accompanied to the defendant's cell by Detective Martino of the South Portland Police Department and allowed to converse with the defendant through the bars of his cell. Martino remained some distance away from the couple but stayed within earshot. At one point, Mrs. Stone asked the defendant if he would require the aid of an attorney. Martino testified that he overheard the defendant reply: "I need a doctor, not a lawyer." Mrs. Stone, on the other hand, testified that at that point the defendant replied: "I need a doctor *and* a lawyer." (emphasis supplied). At the end of the conversation, Martino heard Mrs. Stone assure the defendant that she would go home and try to reach an attorney.

1. The defendant was found to have violated 17-A M.R.S.A. § 202 which, at the time relevant to the case at bar, provided in pertinent part:

   Criminal homicide in the 2nd degree.
   1. A person is guilty of a criminal homicide in the 2nd degree if:
   A. He causes the death of another intending to cause such death, or knowing that death will almost certainly result from his conduct;
   . . . . .

2. The defendant entered pleas of "not guilty" and "not guilty by reason of mental disease or defect" and, while not testifying himself, introduced testimony at trial in an attempt to prove his want of understanding at the time of the alleged crime. After the jury's verdict of guilty, the defendant was remanded to the Department of Mental Health and Corrections for an evaluation prior to sentencing. At the end of the evaluation period, a hearing was held after which the presiding Justice entered the judgment of conviction and sentenced the defendant to forty-five years in Maine State Prison.

3. The validity of this arrest has never been questioned.

4. The defendant was again informed of his rights that evening before the allegedly defective statement was taken.

After Mrs. Stone had departed, sometime around 7:00 p.m., Martino returned to the defendant's cell and, in Martino's words, the following transpired:

I talked to Mr. Stone at that time and I asked him if he had talked to anybody at all during the day, or did he want to bother to talk with anybody about the case, or whether he wanted to wait until he got in touch or his wife got in touch with an attorney. He said he didn't know whether he wanted to talk or not but he would get back to me.

Q. [by Deputy Attorney General Cohen] Then what did you do?

A. I left to go down to the kitchen and get a cup of coffee.

.　　.　　.　　.　　.

Q. And then what took place?

A. I heard Mr. Stone holler, "Detective, I want to talk to you." I went back to the cell block, at that time I guess he saw that I had a cup of coffee and he asked me for a cup of coffee and I said certainly. He said, "I think I would like to sit down and talk with you." I said, "Fine." I went back to the kitchen and made him a cup of coffee.

The defendant was then taken into the "booking room" at the police station, given a cup of coffee, and allowed to put on his shoes which had been removed earlier in the day.

In the meantime, Mrs. Stone had contacted Donald Carter, an attorney who had represented the defendant in an unrelated criminal matter, and had asked him to look into her husband's situation. According to Carter, he first called the South Portland Police Department at 7:31 p.m. reaching Officer Anderson. Anderson testified that he announced over the intercom that an attorney was calling for Mr. Stone. Martino, who testified that he only heard Anderson say that "someone" (otherwise unidentified) was calling for Stone, told Anderson that Stone was in the booking room and that the person should call back at a later time. (It was not possible to transfer a call from the dispatcher's office to the booking room.) Anderson testified that he took this to mean that Stone was being booked and relayed this impression to Carter. Carter, on the other hand, testified that Anderson told him that due to a manpower shortage the defendant could not be brought to the phone immediately, that he (Carter) left his phone number, and that Anderson promised to have Stone return the call. It is undisputed that at the time of this phone call Carter made no request, formal or otherwise, that the police refrain from questioning the defendant.

After he had given him back his shoes and provided him with a cup of coffee, Martino escorted the defendant out of the booking room and into the detective's office where Libby and Detective Bickford of the Maine State Police were waiting. According to Bickford, the interview in the detective's office began at 7:15 p.m. and lasted until 8:23 p.m.[5] The session began with a careful reading of the *Miranda* rights—a recital that the defendant was hearing for the second time that day. The officers did not begin questioning until the defendant indicated he understood those rights, including the right to have counsel present, but would nevertheless prefer to make a statement.[6] Over the next hour or so the de-

5. Due to the conflicting testimony, it is impossible to be precise with regard to the defendant's whereabouts between 7:00 p.m. and 7:30 p.m. Bickford, testifying from his notes, placed the defendant in the detective's office beginning at 7:15 p.m. Martino testified that Carter's first phone call was announced over the intercom while he and the defendant were in the booking room. He testified that he told Anderson to have the person call back later and that he eventually escorted Stone into the detective's office. Libby testified that the interview began shortly after 7:00 p.m. in the detective's office.

Relying on telephone company records, Mr. Carter testified that he had made his first call at 7:31 p.m. and was told that the defendant was in the "back quarter" of the station. Officer Anderson testified that the first call came in around 7:30 p.m., that he spoke over the intercom with a detective who stated that Stone was in the booking room, and that he was told to have the caller phone again later.

6. The station house interview was conducted by Detective Bickford whose testimony re-

fendant narrated the events of December 7 eventually admitting to the Heagerty killing.

Carter testified that he made a second phone call to the police department at about 8:15 p. m. He eventually reached Mr. Stone who told Carter that he had been talking to the police for some time and had made an extensive statement. The officers in the room testified that they overheard Stone telling Carter that he had been advised of his rights, that he had "told them enough," and that "[he didn't] need an attorney, all [he needed was] a sedative." Carter contradicted this somewhat testifying that the defendant had reported only that his mind was "hazy" and that he would like a sedative. Carter then told Stone to put Detective Martino on the line, and Carter informed Martino that he "believed" he would be retained to represent Stone. He asked that no further questioning take place, a request the police honored despite the defendant's subsequent entreaties to continue the interview.

In support of his claim that he was "in a confused, dazed state of mind" and that his waiver of counsel was therefore not knowingly, intelligently, and voluntarily made, the defendant, at the suppression hearing, proffered the testimony of his wife and his attorney. Mrs. Stone testified that her husband had told her at the station house that he wanted to consult with a doctor and a lawyer before making any statements. She found him to be distant, rambling, and somewhat incoherent. Mr. Carter testified

that during the 8:15 p. m. phone call the defendant spoke very slowly, seemed distant, and stated that he wanted a sedative.

The police officers who participated in the interview testified that while nervous at first the defendant gradually settled down and related the events of the previous day in a calm manner. They recalled no requests for medical attention and found him to be generally alert and rational at all relevant times including during the 8:15 p. m. phone call from Carter.

At the close of the evidence, the presiding Justice denied the defendant's motion to suppress the incriminating statement and filed the following order on June 6, 1977:

> The Court finds from the totality of the circumstances in this case that the police officers exercised proper police practice and did not in any way, psychologically or physically, intimidate this Defendant.
>
> The alleged statement was made only after the Defendant indicated to the police that he wanted to talk.
>
> To the Court, this constituted a recanting of any expressed desire that his wife obtain counsel for him or that he desired counsel, and the interrogation was conducted thereafter, after he was fully informed of his rights to have counsel present.
>
> Accordingly, the Court denies the Defendant's Motion to Suppress the Statement, finding that the Defendant knowingly and intelligibly waived his right to have counsel present.

flected a painstaking faithfulness to both the letter and the spirit of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

I read directly from the card. I am a police officer. I caution you that you have the absolute right to remain silent. I asked him if he understood this and he said yes he did. That anything you do say can be used in a court of law against you. And he advised me he understood that.

That you have the right to the advice of a lawyer before and the presence of a lawyer here with you during questioning, and if you cannot afford a lawyer one will be furnished you free for any questioning, if you so desire. I asked him if he understood this and he said yes he did.

. . . . .

. . . Then I read him a waiver on the back of the card. Number one: Do you understand each of these rights I have explained to you. He advised me yes, he did. And number two: Having these rights in mind, do you wish to talk to us now without having a lawyer present, and he said yes, he would.

Q. [by Deputy Attorney General Cohen] Now what was the defendant's demeanor at that time? How would you describe him? A. Well he came in and sat down. He had been given a cup of coffee, he appeared to be nervous at that time but he understood everything that was being said to him. There appeared to be no question but what he understood what I had talked to him about.

Following the issuance of this order, the State requested the court to amend its order to indicate the standard of proof utilized by the presiding Justice. Accordingly, the order was amended as follows:

Pursuant to the State's Motion requesting that this Court specify by what standard of proof it found that Defendant's statements were constitutionally obtained, this Court hereby amends its Order on Motion to Suppress dated June 6, 1977 by stating that the Court found beyond any reasonable doubt that, prior to the statements here in issue, the Defendant was fully informed of his constitutional rights per *Miranda* and he knowingly and intelligently waived those rights; and from the totality of the circumstances in this case, further found beyond any reasonable doubt that Defendant's statements to the police here in issue were made voluntarily. (emphasis supplied).

### I

As the State concedes, the presiding Justice declined to resolve the question of whether the defendant either asked the police for an attorney or, within earshot of a police officer, asked his wife to obtain an attorney. Instead, the presiding Justice concluded that whether or not the defendant ever made such a request his subsequent conduct at the police station "constituted a recanting of any expressed desire . . . to have counsel present." Our review must necessarily proceed on the same basis.

Relying on *Miranda v. Arizona, supra,* the defendant asserts that once an accused requests legal counsel the police may not initiate any further interrogation until such time as the accused has had an opportunity to consult with an attorney. Under this proffered per-se rule, any post-request confession resulting from police-initiated interrogation would be excluded. We reject the proposed rule concluding that it would unnecessarily constrict our review of custodial interrogations without materially advancing the interests underlying the *Miranda* decision and its progeny.

Our discussion leads us to *State v. Capitan,* Me., 363 A.2d 221 (1976). In that case, the police read the defendant his *Miranda* rights and, after a waiver, began questioning him. When the defendant suddenly announced that he intended to consult his lawyer about the matter in question, the police abruptly broke off the interrogation and returned the defendant to his cell. At nine o'clock the next morning, the defendant hailed a nearby officer and asked to speak with him. After a second reading of the *Miranda* warnings, the defendant made an incriminating statement. In finding the statement admissible over a challenge based largely on *Miranda,* we reasoned that the standard for continued questioning after a defendant has asserted his right to counsel was essentially the same as that announced in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), where the defendant had asserted his right to remain silent. We held that as long as the police "scrupulously honored" the accused's "right to cut off questioning," a subsequent waiver of the right to have counsel present would be valid if knowingly and intelligently made. *State v. Capitan, supra* at 224, *quoting Michigan v. Mosley, supra* 423 U.S. at 104, 96 S.Ct. at 326, 46 L.Ed. at 321. We found that the defendant in *Capitan* had "recant[ed] . . . his previously expressed desire to have the advice of counsel before any further interrogation was conducted . . ." and accordingly held the confession admissible. *State v. Capitan, supra* at 224.

The defendant attempts to distinguish between situations where, as in *Capitan,* the accused, after requesting counsel, spontaneously offers an incriminating statement and those where, as here, the statement follows some degree of police prompting. He argues that a per-se rule should apply in the latter situation but not in the former. It is certainly true that where the police continue an interrogation shortly after a request for counsel, an incriminating statement, if forthcoming, will usually be suppressed, but only because the police have not scrupulously honored the accused's right to cut off questioning. *E. g., People v.*

*Parker*, 84 Mich.App. 447, 269 N.W.2d 635 (1978); *People v. Grant*, 45 N.Y.2d 366, 380 N.E.2d 257, 408 N.Y.S.2d 429 (1978). To hold, however, that the product of *any* police-initiated interrogation in a post-request situation must be suppressed *per se* would needlessly rigidify our analysis of police conduct. The language of the *Mosley* Court, in rejecting a per-se rule forbidding renewed questioning after the right to remain silent has been asserted, applies in this case with equal weight.

> [A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. *Michigan v. Mosley, supra* 423 U.S. at 102, 96 S.C. at 326, 46 L.Ed.2d at 320.

Although the Supreme Court has not as yet ruled on the question here presented,[7] the overwhelming weight of authority in both federal and state courts rejects the per-se approach even in situations where the police initiate the interrogation after the accused has asked for an attorney. *E. g., United States v. Rodriguez-Gastellum*, 569 F.2d 482 (9th Cir.) (en banc), *cert. denied*, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978); *Loomis v. State*, 261 Ark. 803, 551 S.W.2d 546 (1977); *Witt v. State*, 342 So.2d 497 (Fla.1977); *Lee v. State*, 239 Ga. 769, 238 S.E.2d 852 (1977); *State v. Greene*, 91 N.M. 207, 572 P.2d 935 (1977). We see no reason to depart from the general rule, expressed in *Capitan*, as well as in the above-cited cases, that the right to have counsel present, once invoked, may later be waived as long as the subsequent waiver is knowingly and voluntarily made and as long as the accused's right to cut off questioning is scrupulously honored. We turn now to the question of whether or not these two criteria were met in the instant case.

II

In *State v. Collins*, Me., 297 A.2d 620 (1972), we held that the prosecution has the burden of establishing the legal admissibility of a confession beyond a reasonable doubt. In this case, the presiding Justice found "beyond any reasonable doubt that, prior to the statements here in issue, the Defendant was fully informed of his constitutional rights per *Miranda* and he knowingly and intelligently waived those rights . . . .." (emphasis supplied). The language used by the presiding Justice indicates an awareness of the *Collins* standard.

■ Finding that the correct standard was applied, we proceed to review the evidence keeping in mind that the presiding Justice's findings must be sustained as long as there exists "rational support for the conclusions he reached." *State v. Collins, supra* at 625.

■ Assuming, as the presiding Justice apparently did, that the defendant at one point asked to speak with an attorney, we find that the police scrupulously honored the defendant's right to cut off questioning and thus satisfied the standard we adopted in *Capitan*. The record discloses that the defendant made his request, if at all, at approximately 1:00 p. m. while being transported to the Portland Police Department in a police cruiser. Whether at that time the defendant in fact asked for an attorney or merely indicated that he did not wish to discuss his activities with the officers, it is uncontroverted that all efforts to question the defendant ceased immediately. Thereafter, more than six hours elapsed before Detective Martino attempted to reopen communications with the defendant.

We reject the defendant's assertion that Martino engaged in illegal or unethical practices in an attempt to extract an incriminating statement from the defendant. It is clear that Martino was not aware that the defendant may have asked the police to provide him with an attorney; and al-

---

7. In *Brewer v. Williams*, 430 U.S. 387, 397, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424, 435 (1977), the Court treated only the defendant's sixth amendment right to counsel finding "no need to review . . . the doctrine of *Miranda v. Arizona* . . . .."

though Martino had overheard Mrs. Stone assure the defendant that she would try to obtain counsel, that fact standing alone does not taint Martino's subsequent exchange with the defendant. *Narro v. United States*, 370 F.2d 329 (5th Cir. 1966); *People v. Hill*, 6 Ill.App.3d 746, 286 N.E.2d 764 (1972); *People v. Smith*, 108 Ill.App.2d 172, 246 N.E.2d 689 (1969), *cert. denied*, 397 U.S. 1001, 90 S.Ct. 1150, 25 L.Ed.2d 412 (1970).

Our examination of the record leads us to conclude that Martino's actions were entirely proper. He approached the defendant and asked if he wanted "to talk with anybody about the case, *or whether he wanted to wait until he got in touch or his wife got in touch with an attorney.*" (emphasis supplied). The fact that Martino's statement was coupled with a reminder that the defendant had the ever-present option of consulting with an attorney dispels the notion, advanced in the defendant's brief, that the defendant's willingness to talk was the product of "subtle coaxing" on Martino's part. When the defendant indicated his uncertainty whether to talk or not, Martino respected the defendant's wishes and immediately left the cell block area. It was only when the defendant cried out to Martino indicating a desire to talk with him that the interrogation process was set in motion.

The presiding Justice's finding that the defendant had been given his *Miranda* rights also rests on firm support. The record clearly and distinctly reveals that the defendant was informed of his rights on two separate occasions, once in the afternoon shortly after he was arrested and again immediately prior to the incriminating statement. The interrogation that produced the confession did not begin until the defendant had signified that he understood his constitutional rights but would nevertheless prefer to discuss his activities with the police without benefit of legal counsel.

The evidence taken at the suppression hearing also supports the finding in the Superior Court that the police acted properly and made no effort to intimidate the defendant. The defendant's statement came after a relatively short period of incarceration: a little over eight hours. The interview was also brief, roughly one hour, and took the form of a calm narrative on the part of the defendant with the policemen interrupting only occasionally to ascertain the time frame of the events being discussed. No promises were made, and no abuse of a physical or psychological nature was inflicted. The defendant, no stranger to the criminal process, was given food and coffee and allowed to speak to his wife when she arrived. In short, the atmosphere surrounding the defendant's confession was a far cry from the rubber-hose-and-naked-light-bulb atmosphere that motivated the *Miranda* Court to formulate its prophylactic rules.

In sum, we find abundant support in the record for the presiding Justice's finding that the defendant's waiver of his right to counsel and right to remain silent was, beyond reasonable doubt, knowing and voluntary.

We do not find persuasive the defendant's argument that the sixth amendment had attached within the meaning of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and that the custodial interview in the absence of counsel was therefore impermissible per se. No indictment had been returned, no preliminary hearing had been held, and no arraignment had taken place. Generally speaking, the sixth amendment attaches at the commencement of adversary judicial proceedings. *See Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (no sixth amendment attachment at post-arrest pre-indictment lineup). *See also Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (post-arraignment attachment); *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (attachment at preliminary hearing); *Massiah v. United States, supra*, (post-indictment attachment). We agree with the reasoning expressed by the Supreme Court of California in *People v. Wong*, 18 Cal.3d 178, 188, 133 Cal.Rptr. 511, 515, 555 P.2d 297, 301

(1976), that if the sixth amendment came into play during the investigatory stage of a criminal proceeding, "interrogation of suspects could be delayed indefinitely while the officers attempted to locate the suspect's counsel, notify him of the proposed interview, and either obtain his consent thereto or permit his participation therein." The accused who is subjected to a custodial interrogation prior to the commencement of judicial proceedings is more than adequately protected against coercive treatment. He has the right to remain silent, he has the right to have counsel present free of charge, and he has the right to cut off questioning. Furthermore, any alleged waiver of these rights must be proved by the prosecution beyond a reasonable doubt to be a knowing and intelligent waiver. To extend the full measure of the sixth amendment's protections to the pre-judicial stage would greatly encumber police investigations with little added benefit to the accused.[8]

■ The defendant further argues that the police unlawfully interfered with his right to the assistance of counsel allegedly by denying the defendant telephone access to Mr. Carter. The record itself presents a confusing maze of testimony with substantial conflicts as to the whereabouts of the defendant when the first call came in between 7:00 p. m. and 7:30 p. m. and as to the content of the statements made by Carter, Anderson, and Martino.[9] The presiding Justice, who found "proper police practice," could well have concluded that Martino was unaware that the caller was a person claiming to represent Stone. It is undisputed that Carter did not, at the time of his first

call, instruct the police not to question Stone. It is also undisputed that the police complied fully with the request made at the time of the second phone call: Stone was not subjected to any further questioning despite his entreaties. Accordingly, we discern no reason to disturb the finding of the presiding Justice of "proper police practice."

### III

■ The defendant finally argues that he was incompetent to make an effective waiver of his rights on the evening of December 8. Although we are not entirely sure whether this issue was ever squarely presented to the Superior Court,[10] we are satisfied that defendant's waiver was competent. The presiding Justice's finding, beyond a reasonable doubt, that defendant made a knowing, voluntary, and intelligent waiver was by plainest implication a finding of competence amply sustained by the record.

The testimony of defendant's wife and his lawyer, which in any event the presiding Justice was free to discredit, tended merely to depict the defendant as being somewhat detached and uncommunicative. The unanimous testimony of the police officers was that the defendant was calm and rational throughout. In short, the record indicates that the defendant was "fully in touch with reality, acted and spoke rationally, and otherwise showed by his conduct that he was fully aware of, and appreciated, the nature and quality of what was involved and at stake . . . ." *Collins, supra* at 629.

---

8. The defendant also argues that after his arrest the police delayed unnecessarily in bringing him before a magistrate. M.R.Crim.P. 5(a). The defendant's motion to suppress filed in the Superior Court bears no mention of this issue, nor was it developed at the suppression hearing. We will not consider issues not properly developed below. *State v. Carney*, Me., 390 A.2d 521 (1978).

9. *See* note 5 *supra* and accompanying text.

10. In his motion to suppress, the defendant alleged that he was dazed and confused and had asked to see a doctor "and as such did not

knowingly, intelligently and voluntarily waive his constitutionally guaranteed rights including his right to remain silent and right to counsel." Although the motion fails explicitly to allege incompetence on the part of the defendant and fails to draw into question the defendant's waiver of the *Miranda* rights *eo nomine*, we think that in the circumstances presented a fair reading of the motion raises the issue of competence with respect to any waiver the defendant was alleged to have made on the night in question.

In urging this Court to reverse the finding, the defendant proffers expert testimony which was adduced at trial on the issue of the defendant's sanity. No expert testimony was introduced at the suppression hearing.

We refuse to consider this testimony on two grounds. First, the evidence was calculated to establish insanity, not incompetence. We have had occasion in the past to distinguish these two concepts. In *State v. Collins, supra* at 627–28, we emphasized that an accused's competence to waive constitutional rights was akin to his competence to stand trial and that a similar standard should be used in assessing each. *Collins* also reemphasized the point already made in *Thursby v. State*, Me., 223 A.2d 61, 67–68 (1966), that insanity and incompetence are two distinct concepts in the law. It follows that testimony directed at one of these issues will not necessarily shed light on the other.

We also note that the expert testimony was not introduced at the suppression hearing and that the presiding Justice was therefore not given an opportunity to evaluate the testimony as it bore on the issue of the defendant's competence to waive his constitutional rights. The defendant cannot supplement the record on appeal with evidence not properly presented to the original finder of fact. *See State v. Collins, supra* at 625 n.3.

The entry is:

Appeal denied.

Judgment affirmed.

GODFREY, J., did not sit.