STATE of Missouri,
Plaintiff–Respondent,

v.

Stephen BATES, Defendant–Appellant.

No. 11554.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 22, 1980.

Appellant's Motion for Rehearing and for Transfer Denied Oct. 20, 1980.

Application to Transfer Denied
Dec. 15, 1980.

John Ashcroft, Atty. Gen., Jan Bond, Asst. Atty. Gen., Jefferson City, for plaintiff–respondent.

Terry Daley, Public Defender, Albert Crump, Jr., Asst. Public Defender, Rolla, for defendant–appellant.

MAUS, Judge.

The defendant was convicted by a jury of second degree felony murder and sentenced to imprisonment for 25 years. The gravamen of the state's case was that the defendant, in the process of stealing the victim's jacket, billfold and pocketknife, pushed the intoxicated victim from his pickup truck into the snow as a result of which he died. The defendant appeals presenting two points of alleged error. While the defendant does not in general question the sufficiency of the evidence, a brief summary of the facts is required as the background for consideration of the two "points relied on". Considering the evidence and all inferences reasonably to be drawn therefrom most favorably to the state as required by the jury verdict, *State v. Franco*, 544 S.W.2d 533 (Mo. banc 1976), those facts are as follows.

On the evening of January 24, 1979, the defendant and the victim spent several hours drinking beer in a bar in Rolla. The victim drank more than the defendant and was quite intoxicated when the two left the bar at approximately 9:30 p. m. The record does not show if they had been previously acquainted. They left in the victim's pickup truck, with the victim driving. The defendant thought the victim was going to drive him to another bar. Instead, the victim drove to the defendant's apartment. There, the victim shoved the defendant as if to push him from the pickup. The defendant pushed the victim back and the victim fell over in the seat. The defendant assumed the victim had passed out because of too much alcohol. The defendant then got in the driver's seat and drove a short distance from Rolla on Highway CC. There, even though the road was covered with ice and snow, the defendant pushed the victim from the pickup onto the roadway. The victim was clad only in blue jeans and a T–shirt. The temperature was approximately 10 degrees and there was a strong wind blowing. The defendant still thought the victim had passed out from alcohol and "figured the man would sober up when the cold hit him". The body of the victim was discovered a few minutes past 10:00 p. m. There was evidence a vehicle with snow tires similar to those on the victim's pickup truck had run over the victim's legs. However, there was no direct evidence that it was the victim's pickup and it was estab-

lished the bruise marks on the victim's legs had nothing to do with his death.

The defendant left in the victim's pickup intending, according to his statement, to go to the home of a friend near Cardwell, Missouri. He stopped about 11:00 p. m. at the home of an aunt near Licking, Missouri, but she refused to admit him. Again according to his statement, he got lost and wound up in Jonesboro, Arkansas, where the pickup ran out of gasoline. He then hitchhiked to the home of his friend in Cardwell. He stayed there until the next morning when he hitchhiked back to Rolla. He was arrested at his apartment the following evening. The pickup was recovered in Jonesboro, Arkansas, although a fire had been started with a plastic seat cushion in the cab of the pickup. The defendant had taken the victim's jacket, billfold and pocketknife. The jacket and pocketknife were left with the friend. The billfold was never recovered.

The defendant's first point is that the trial court erred in admitting his statement to deputy sheriff Smith. When he was arrested, the defendant was given the Miranda warning,[1] although the arresting officers did not question him. The defendant said he wanted a lawyer. Upon reaching the jail, he called a lawyer, but did not reach him. He was then consecutively questioned by two officers of the Missouri Highway Patrol. It is not shown that either officer knew of the questioning by the other. The defendant stated the first officer advised him of his Miranda rights, but he made no statement concerning whether or not the second officer did likewise. Defendant related that the first officer encouraged him to make a statement in that the officer promised him the officer would get him "life in the penitentiary or life in the Fulton State Hospital for the rest of my life". Defendant related the second officer extended to him a promise of help. He made no statements to these officers but told them he wanted a lawyer and wanted to be locked up. He was not immediately taken to a cell but was left in what was termed the deputies' room.

About 15 minutes later deputy sheriff Smith, who had nothing to do with the investigation, entered that room to check on a hot-water heater. Smith testified he greeted the defendant who said "I would like to talk to you Smitty". On direct examination the defendant ambiguously related a slightly different prelude, but on cross-examination tacitly admitted this opening gambit as stated by Smith.

However, Smith stopped the defendant from making any statement until Smith left the room and returned with a "waiver of rights" form and a tape recorder. The defendant read and signed the waiver of rights form. Smith then recorded an interview with the defendant. The deputy opened that interview with an oral statement of the full Miranda warning which contained the defendant's acknowledgment of his understanding of his rights and that he was "ready and willing to answer questions or to make a statement without first consulting with a lawyer and with having a lawyer present during questioning". There was a further acknowledgment that no promises or coercion had been used against him. Smith then took a concise oral statement, the transcript of which demonstrates that it was taken with fairness to the defendant, who answered the questions alertly. The recording was taken to a stenographer and transcribed. The typed statement containing the Miranda warning, waiver of rights and acknowledgment, was returned to the defendant who read the transcribed statement and signed each page.

Nevertheless, the defendant argues that the statement was inadmissible because he had told the arresting officer and the highway patrolmen that he wanted a lawyer. He primarily relies upon that part of Miranda which reads as follows:

If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 723 (1966).

He also relies upon *State v. Stevenson*, 523 S.W.2d 349 (Mo.App.1975).

While not couched in those terms, his argument is based upon the proposition that *Miranda* compels the conclusion that his request for a lawyer was irrevocable and a subsequent statement made without the presence of a lawyer is inadmissible, a doctrine that has been referred to as the "per se rule". The general question of the right of an individual to recant an expressed desire to remain silent or for a lawyer has been dealt with by the United States Supreme Court in two subsequent cases.[2] In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the defendant, who was arrested in connection with certain robberies, expressed a desire to remain silent and his interrogation ceased. When he was subsequently questioned concerning a murder, after being advised of his rights, he gave an inculpatory statement. In holding that statement admissible, the court said: "Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Mosley*, supra, 423 U.S. at 102–103, 96 S.Ct. at 326, 46 L.Ed.2d at 321.

In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the defendant, having been arrested for murder, expressed a desire for a lawyer. However, as a result of officers' remarks in his pres-

ence, he directed the officers to the victim's body. In rejecting that evidence the court said: "The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." *Brewer*, supra, 430 U.S. at 405–406, 97 S.Ct. at 1243, 51 L.Ed.2d at 441. (Emphasis added)

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the defendant asked for a lawyer, consulted one lawyer and made arrangements to consult with another upon reaching the place to which he was being transported. During the trip, the remarks of the officers transporting him prompted him to reveal the location of a shotgun. The court held that evidence admissible as the officers' remarks were found not to be the equivalent of interrogation and in so doing, the court noted: "Since we conclude that the respondent was not 'interrogated' for *Miranda* purposes, we do not reach the question whether the respondent waived his right under *Miranda* to be free from interrogation until counsel was present." *Innis*, supra, 100 S.Ct. at 1688, 64 L.Ed.2d at 306.

▮ The per se rule has been recognized. *People v. Cunningham*, 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360 (1980). However, the overwhelming majority view is that there is no per se bar to the revocation of an expressed desire for a lawyer. *White v. Finkbeiner*, 611 F.2d 186 (7th Cir. 1979); *United States v. Rodriguez–Gastelum*, 569 F.2d 482 (9th Cir. 1978); *State v. Stone*, 397 A.2d 989 (Me.1979); *People v. Gutierrez*, 77 Ill.App.3d 772, 33 Ill.Dec. 326, 396 N.E.2d 853 (1979); *State v. Manning*, 380 So.2d 46 (La.1980); *State v. Singleton*, 288 Or. 89, 602 P.2d 1059 (1979); *State v. Bradley*, 255

2. While there is a difference of opinion on the topic, it has been said: "It does not matter whether the right not to make statements in the absence of counsel stems from *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), or *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [10 Ohio Misc. 9, 36 Ohio Ops.2d 237, 10 A.L.R.3d 974] (1966). In either case the question is one of waiver." *Brewer v. Williams*, 430 U.S. 387, 430, 97 S.Ct. 1232, 1256, 51 L.Ed.2d 424, 456–457 (1977).

S.E.2d 356 (W.Va.1979).[3] The majority view has been adopted by the Eastern District of the Missouri Court of Appeals, *State v. Blevins*, 581 S.W.2d 449 (Mo.App.1979) and so does this court.[4]

The purpose of *Miranda* was "to protect what the Court there said was a person's constitutional privilege against compulsory self–incrimination." *Mosley*, supra, 423 U.S. at 100, 96 S.Ct. at 325, 46 L.Ed.2d at 319. The Sixth Amendment, if applicable to the investigatory stage reached in this case,[5] guarantees that a defendant shall have the right to counsel but should not be construed to force counsel upon him. The Constitution is the revered safeguard of individual rights, but it should not be construed to construct barriers to the investigation of the truth aided by voluntary statements. To adopt the per se rule "would be to 'imprison a man in his privileges.'" *Michigan v. Mosley*, concurring opinion of White, Judge, supra, 423 U.S. at 109, 96 S.Ct. at 329, 46 L.Ed.2d at 324.

The exact guidelines of the burden the state must meet to establish an effective recantation of an expressed desire to remain silent or for a lawyer are for from clear. *People v. Gutierrez*, supra; *State v. Bradley*, supra; *State v. Manning*, supra. The United States Supreme Court has said: "We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously

honored.'" *Mosley*, supra, 423 U.S. at 104, 96 S.Ct. at 327, 46 L.Ed.2d at 321. It would seem sufficient if the change of mind is not the product of interrogation in violation of that right and under the totality of the circumstances the waiver by the change of mind meets the standards of *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).[6] *State v. Stone*, supra; *People v. Morgan*, 77 Ill.Dec. 69, 67 Ill.2d 1, 364 N.Ed.2d 56 (1977); *State v. Manning*, supra. In this case, there was an appreciable interval between the interrogation by the last highway patrolman and the statement.[7] The statement was taken only after the defendant had volunteered,[8] only after he was, for at least the third time, advised of his rights and only after he had expressly waived those rights.[9]

Without suggesting the standard for recantation to be other than as set forth above, the defendant's recantation met the most stringent of suggested standards, that suggested in the concurring and dissenting opinion of Circuit Judge Goodwin in *United States v. Rodriguez–Gastelum*, supra. The defendant's recantation was explicit, it was initiated by the defendant, and it was not induced by the law enforcement officers.

■ The defendant's second point is that the evidence was insufficient to establish the actions of the defendant were the cause of the victim's death. Those actions were pushing the victim, unconscious from alcohol and clad only in blue jeans and a T–

---

3. Additional cases are cited in *State v. Stone*, 397 A.2d 989 (Me.1979).

4. For cases involving an ambiguous statement concerning whether or not a defendant desired an attorney see *Nash v. Estelle*, 597 F.2d 513 (5th Cir. 1979); *State v. Smith*, 588 S.W.2d 27 (Mo.App.1979).

5. See *State v. Stone*, supra, n. 3.

6. *North Carolina v. Butler*, 441 U.S. 369, 374–375, 99 S.Ct. 1755, 1759, 60 L.Ed.2d 286, 293–294 (1979) holds that at least initially "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case."

7. For a discussion of this factor see *White v. Finkbeiner*, 611 F.2d 186 (7th Cir. 1979).

8. "Of course, in those cases where the suspect does initiate the waiver, it will be much easier for the state to discharge its heavy burden. But, this does not mean that where the police contact the suspect after a request for counsel the prosecution is prohibited from ever demonstrating a waiver." *White v. Finkbeiner*, supra, n. 7, at p. 192.

9. *State v. Stevenson*, 523 S.W.2d 349 (Mo.App. 1975), cited by the appellant does not aid him. The facts in this case establish the alternative procedure suggested by *Stevenson*, supra, for the defendant to fully waive again his right to remain silent and his right to consult with counsel.

shirt, from the pickup onto a road covered with ice and snow, when the temperature was 10 degrees with a strong wind blowing, and then leaving him there. The evidence on this point consists of those facts established by the defendant and other witnesses and the expert testimony of a pathologist called by the state and a pathologist called by the defendant.

The defendant and the victim left the bar at approximately 9:30 p. m. and after a brief stop at the defendant's apartment, drove the few miles to the scene. The victim's lifeless body was found a few minutes after 10:00 p. m. The body was taken to a hospital and then to a funeral home where the coroner performed an autopsy. The coroner was a medical doctor, qualified as a pathologist who had practiced his profession for eight years. The autopsy was performed at approximately 11:00 p. m.

The victim's body temperature was 96 degrees. His blood contained 0.37 per cent alcohol. The victim had a grossly enlarged heart and changes in his liver consistent with a long term use of alcohol. The coroner also took and examined microscopically a variety of specimens. Neither direct or cross–examination developed what specimens were so taken or the results of the examination. The coroner determined that there was "no disease process in the heart or brain or lungs and various internal organs that would have accounted for the death". He concluded the death was "due to exposure to cold and alcoholic intoxication".

He further stated that with a negative autopsy, alcohol alone above a level of 0.35 per cent could be responsible for death. However, he added that with prolonged usage, an individual develops a tolerance of alcohol. He further testified that alcohol is a depressant and could cause death with a lower level of alcohol when exposed to cold than when not so exposed. He repeated his statement that the autopsy of the victim was not negative and his opinion that alcohol was not the sole cause of death.

The defendant called a medical doctor who was qualified as a pathologist and had practiced her profession for 13 years. Her testimony was based upon the report of the coroner. She had not seen the specimens, slides or pictures made in connection with the autopsy nor discussed the autopsy with the coroner. She did not accept the proposition that prolonged use increases tolerance of alcohol. She stated that a high level of alcohol is believed by some to increase tolerance to cold, that it is in effect a form of antifreeze. However, she added that alcohol dilates the blood vessels and thereby heat radiates from the body more rapidly than otherwise. She attributed the victim's grossly enlarged heart to his use of alcohol and said that such an enlarged heart could cause death. She agreed that a qualified individual performing an autopsy is better prepared to give an opinion as to the cause of death than one who did not. She added that a concentration of 0.4 per cent is the accepted level for coma and that death is a step beyond coma.

■ The defendant primarily bases his second point upon the following quotation from *State v. Brinkley*, 354 Mo. 1051, 1067, 193 S.W.2d 49, 54 (1946):

> The applicable rule, as stated in *Guthrie v. City of St. Charles*, 347 Mo. 1175, 1188, 152 S.W.2d 91, 97(8), is that where a plaintiff shows a casualty resulted from one of several causes, for only part of which the defendant was responsible, no case is made—unless the evidence also shows a *greater probability* that the proximate cause was one for which the defendant was liable. (Emphasis in original).

That general doctrine has been quoted with approval in *State v. Williams*, 588 S.W.2d 70 (Mo.App. 1979) and *State v. Zweifel*, 570 S.W.2d 792 (Mo.App. 1978). However, even assuming that to be a correct doctrine, it does not control the decision in this case. The doctrine by its own terms is applicable where death results from one of several causes. Death may result from two or more causes and it is not necessary that the act of the defendant be the sole cause of the victim's death. The rule applicable to the case is also stated in *State v. Brinkley*, supra, 354 Mo. at 1068, 193 S.W.2d at 55.

So far as that one point is concerned, a person is criminally responsible for a homicide in whatever manner or by whatever means it was accomplished, provided it was proximately caused by his unlawful act. And the unlawful act need not be the immediate cause of death. It is enough that it be a contributing proximate cause, although other contributing causes may have intervened.

This rule has received similar expression in other cases. " 'If the deceased was in feeble health and died from the combined effects of the injury and of his disease, or if the injury accelerated the death from the disease, he who inflicted the injury is liable although the injury alone would not have been fatal.' " *State v. Frazier*, 339 Mo. 966, 977, 98 S.W.2d 707, 713 (1936).

Alcoholism and sodden drunkenness may indeed have been a contributing factor in Phylliss' death, as the doctor explained, but if so it was the appellant's misfortune to have assaulted a person whose death would be accelerated due to her physical condition, it is as if he had struck a hemophiliac 'one moderate blow with his fist' and 'the injury accelerated the death from the disease.' *State v. Johnson*, 475 S.W.2d 95, 97 (Mo. 1971). Also see *State v. Lusk*, 452 S.W.2d 219 (Mo.1970); *State v. Cooley*, 387 S.W.2d 544 (Mo.1965); *State v. Banister*, 512 S.W.2d 843 (Mo.App. 1974).

It is true that neither party chose to develop, by direct or cross–examination, how death results from excessive blood alcohol. Nor does the record reveal the mechanics of how excessive alcohol combined with exposure to cold would produce death. Nevertheless, the coroner unequivocally testified that death was due to alcoholic intoxication *and* exposure to cold. He was equally positive that the autopsy was not a negative autopsy and alcoholic intoxication was not the sole cause of death. This conclusion was not really questioned by the pathologist called by the defendant. This doctor testified 0.4 per cent alcohol is the accepted level for coma and death is a step beyond coma. This testimony supports the conclusion that another factor, exposure to cold, contributed to the death of the victim whose blood contained 0.37 per cent alcohol. In all events, there was substantial evidence from which the jury could conclude that exposure to cold did contribute to the victim's death and that is sufficient. The judgment is affirmed.

BILLINGS, P. J., and HOGAN, J., concur.