Ruth Della SUMLIN *v.* STATE of Arkansas

CR 78-168                                          587 S.W. 2d 571

Opinion delivered October 15, 1979
(In Banc)

*Solloway & Jackson, P.A.,* by: *Lanny K. Solloway,* for appellant.

*Steve Clark,* Atty. Gen., by: *Ray Hartenstein,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. On Thanksgiving day in 1977, Ruth Della Sumlin participated in an escapade that resulted in her being charged with capital murder. She was charged with the murder of J. Y. Cooper in the course and furtherance of being an accomplice to escape in the first degree. She was also accused of robbing Cooper. She was tried in the Columbia County Circuit Court, convicted and sentenced to life imprisonment without parole.

On appeal she alleges nine errors. We find on review none of these errors require reversal of the conviction or sentence. We have also examined the record for all other legal errors, as is our practice in cases of like punishment, and finding none prejudicial, affirm her conviction and punishment.

The facts concerning a jail break from the Columbia County Jail, around which all events of this case focus, are not seriously disputed.

Ruth Sumlin, formerly Ruth Brewer of Bradley, Arkansas, was a college student at Magnolia when she met Sumlin in October, 1976. She knew him as Warren Andrews from California. According to her, they kept steady company after they met. At the end of school in May, 1977, she only lacked a few hours toward a degree in psychology. She did not return to school in the fall of 1977, reciting a lack of money as the cause. She married Sumlin on October 2, 1977, while he was in the Columbia County Jail. Warren Sumlin, known to her as Andrews, had been in jail since August, 1977, pending the outcome of extradition proceedings initiated by California on a murder charge.

There is no doubt they had discussed breaking him out of jail, either by way of her supplying him a gun, or by forcing the jailer to release him. They discussed getting J. Y. Cooper's car for the escape. She was allowed generous visiting privileges with her husband by the jailers, both of whom were later fired for their laxness.

On Thanksgiving evening about 10:00 p.m., she went to the jail, held a pistol and knife on the jailer and forced him to open the cells. Five prisoners escaped, including Warren Sumlin; several other prisoners voluntarily remained at the jail.

Warren and Ruth Sumlin, Thurman Moore, Jr., and Jackie Moore left the jail in a Pontiac automobile which belonged to J. Y. Cooper. About four hours later the Sumlins were in the custody of the Fordyce city police; Thurman Moore, Jr., was in custody and hospitalized for gunshot wounds; Jackie Moore was missing and remained so until he

was located in Michigan several months later. The other escapees were rounded up that night by local law enforcement officers.

The nest day, Friday, J. Y. Cooper's body, clothed only in socks and an undershirt, was found by two hunters on a logging road east of Magnolia. He was dead, having been shot through the temple; there was also evidence his sexual organs had been mutilated.

The State's case was that Ruth Sumlin had killed J. Y. Cooper, emasculated him and took his car to be used as a getaway vehicle, forced the jailer to release the prisoners and then joined the escapees in flight.

Ruth Sumlin gave two versions of what transpired. In a statement to the police officers she admitted planning to get Cooper's vehicle to be used in the escape. She explained she and Cooper had been out before and that she and Warren Sumlin had discussed getting Cooper's vehicle. She went out with Cooper that afternoon, later that evening they drove to a back road and had sexual intercourse. Then she shot Cooper and took his car. Later she forced the jailer to release the prisoners at gun and knifepoint.

In her testimony at the trial she largely repudiated this statement. She admitted having sexual intercourse with Cooper — they had seen each other on other occasions — but denied she killed him. She said he was in the back seat of his car, drunk, when they all got in the car after the jail break. She said Warren killed Cooper later, or at least he took Cooper down the road and when she heard a shot, assumed he had killed Cooper. She said Warren killed Cooper because he knew Cooper had "disrespected" her.

She denied at all times mutilating Cooper's sexual organs, suggesting that the car had backed over his body, or perhaps Warren Sumlin had done it. There was evidence the car ran over Cooper's legs.

The two escapees did not fare well on their journey with the Sumlins. Both testified for the State and gave similar ver-

sions of what transpired.

Thomas Moore, Jr., who had been in jail about two weeks, said he knew in advance of the jailbreak. He said he saw Ruth Sumlin hold a gun and knife at the back of the jailer before the cells were opened. Jackie Moore said he saw her with a gun on the jailer. Both stated they were with the Sumlins at all times until they left the car near Fordyce; both said no one else was in the car — contradicting Ruth's trial version that Cooper was in the back seat drunk and was later shot by Warren Sumlin.

Both Moores rode in the front seat of the Pontiac, first one and then the other drove. The Sumlins were in the back seat. They first stopped in Magnolia for gas, and then at Cairo for liquor. Next, they drove to El Dorado, trying to decide what to do; they then headed back north on the highway toward Fordyce.

According to Ruth, Warren was drinking heavily during the trip and he became unruly. More liquor was found in the trunk of the car which he began to consume. She said Warren took about $35.00 from Cooper's wallet which was in the car. Warren Sumlin learned that one of the Moores had about $160.00 and he decided to kill them both. He had been shooting a pistol — she had found Cooper's .22 caliber pistol and Warren Sumlin had it — out of the speeding car. He told her to shoot one at the same time he shot the other. His gun "clicked" several times, apparently misfiring, then it fired; then she fired her gun. Apparently the car was stopped at this time, and both Moores bailed out immediately after the shooting. Both Moores had been struck by bullets, Jackie in the head, Thurman in the neck. Thurman ran and hid in the woods, Jackie ran down the road. Sumlin pursued, firing his gun. Ruth Sumlin also fired her gun at them. Jackie Moore was able to escape, eventually reaching Michigan.

About this time two strangers happened along in a vehicle. Warren was still chasing the Moores; Ruth, in trying to drive the car, had run it into the ditch. The strangers stopped to help with the car and then Warren came back. According to Ruth, he robbed one of these men of his billfold after he

shot him, and they took the strangers' vehicle.

A Fordyce policeman came on this scene, about seven miles from Fordyce, in answer to a radio call and gave chase to the Sumlins. He was able to stop them; Ruth ran to the policeman who put her in his vehicle. According to Ruth and the policeman, Warren Sumlin tried to drive off and being foiled in his efforts, rammed the strangers' vehicle into the policeman's car. He was subdued and arrested at this time.

It was about 2:00 a.m., the day after Thanksgiving, when the Sumlins were taken into custody by the Fordyce policeman.

Ruth Sumlin remained in the custody of the Fordyce police until she was transferred to the custody of Dallas County Sheriff, Joe Pennington, about daylight, the 25th of November. She remained there until about 7:00 p.m., when she was transferred to the Columbia County Jail. On Sunday, the 27th, the Columbia County Sheriff told Ruth Sumlin he was transferring her to the El Dorado jail. At this time she made a statement. Before, she had refused to talk either with Dallas or Columbia county officials.

The State's case against Ruth Sumlin regarding the jail break was strong. There were many witnesses telling substantially the same story — she forced the escape as we have described.

The evidence conflicted regarding the murder of Cooper and his emasculation. In her confession she admitted shooting Cooper, but in her testimony she denied it. She explained that she had been covering up for Warren Sumlin and had decided to tell the jury the truth. She testified Warren Sumlin killed Cooper. A good deal of testimony conflicted with her trial version of the events.

The medical officer who performed the autopsy on Cooper said Cooper was killed by a gunshot wound to the head. No alcohol was found in Cooper's bloodstream. The scrotum and perineal area had been cut with an edged instrument. The scrotum and its contents were absent.

Cooper had type O blood. A crime laboratory technician testified that he found human type O blood on the blade of a knife, one found in Ruth Sumlin's purse when she was arrested.

Tissue paper, containing semen and blood, was found around Cooper's body. This evidence was all consistent with the State's theory of the case that Cooper and Ruth Sumlin had intercourse beside the road and that Ruth Sumlin killed Cooper at the same place. She said the tissue paper must have been thrown from the car since she claimed in court that the sexual act occurred in the back seat — where Cooper remained drunk until Warren Sumlin killed him. It was coincidental she explained that Warren Sumlin killed Cooper at the same place she and Cooper had intercourse hours before.

The appellant, Ruth Sumlin, does not argue there was not substantial evidence to support her conviction, as there no doubt was. Her arguments are mostly procedural, that certain evidence was improperly admitted and the court made procedural mistakes, prejudicing her right to a fair trial.

The first allegation of error is regarding the in-custody statement of Ruth Sumlin; that it was inadmissible because it was not voluntary.

The law is well settled in this area, being only a matter of applying the law to the facts of this case. The State has the burden of proving an in-custody statement is voluntary. *Giles v. State*, 261 Ark. 413, 549 S.W.2d 479 (1977); *Boyd et al v. State*, 230 Ark. 991, 328 S.W.2d 122 (1959). On appeal we make an independent determination, considering the totality of the circumstances surrounding the statement, of whether the statement was voluntarily given. The trial court found Ruth Sumlin's statement voluntary and we will not reverse that finding unless it was clearly erroneous. *Bell & Walker v. State*, 258 Ark. 976, 530 S.W.2d 662 (1975); *Harris v. State*, 224 Ark. 314, 425 S.W.2d 293 (1968). Often a factor is the ability of a defendant to understand his rights. *Whitmore v. State*, 263 Ark. 419, 565 S.W.2d 133 (1978).

We conclude the essential circumstances surrounding the appellant's statement are as follows. Ruth Sumlin had completed 3½ years of college toward a psychology degree. There is no evidence she suffered from any physical or mental infirmity. She was advised of her rights by every law enforcement department that had custody of her, the Fordyce City Police, the Dallas County Sheriff's office, and the Columbia County Sheriff's office. While she was handcuffed to a chair for a good part of the 25th of November, she was not physically abused. She admitted she was not threatened but she did complain an officer talked roughly to her once when she was on the phone.

While she was in Dallas County the officers were still looking for escapees and Cooper's body was discovered. Considering she was a participant in a major jailbreak, the officers were not intolerant of her nor abusive of her.

She refused to talk to the authorities after twice being warned of her rights. The evidence indicated she asked for a lawyer. A great preponderance of the evidence reflects the officers ceased questioning her when she asked for a lawyer.

After she and Warren Sumlin were taken to the Columbia County Jail, the evening of the 25th, she was again informed of her rights and refused to make a statement.

Sunday, the sheriff told her she was being transferred to El Dorado. The sheriff in his testimony explained he had no facilities for a female prisoner.

The sheriff's version and hers do not vary greatly as to exactly what was said. The sheriff said she wanted to stay near her husband and decided to make a clean breast of it. She said the sheriff asked if she wanted to talk before they went to El Dorado.

There is no doubt she asked for a chance to talk to her husband first. She was allowed to do so and told him she was going to make a statement. She said he told her to remain quiet and get a lawyer. She testified she decided to talk anyway because she could not change her mind once she told

the officers she would make a statement.

She also asked to be permitted to make a phone call before making a statement. She was allowed to call a neighbor of hers; she told her she was going to confess.

Then she made a statement on tape, which was used later in her trial. It opened and closed with her being informed of her rights. Never once did she say she wanted a lawyer.

The single fact she had once asked to see a lawyer does not vitiate her subsequent statement. See *Michigan* v. *Mobley*, 423 U.S. 96 (1975) and compare with *Rutledge* v. *State*, 263 Ark. 781, 567 S.W.2d 283 (1978). Otherwise, a defendant could never voluntarily make a statement, once refusing to talk before a lawyer is present. It is a question of whether she voluntarily confessed. We have no doubt she did; we conclude she made the statement knowing what she was doing, well aware of her rights.

It is argued the court improperly admitted the tape recording of the confession since only a transcript was available at the *Denno* hearing. The judge was right, the tape was the best evidence of the confession. Rule 1002, Uniform Rules of Evidence. See, also, *Baysinger* v. *State*, 261 Ark. 605, 550 S.W.2d 445 (1977).

A knife, J. Y. Cooper's billfold and a letter were found in Ruth Sumlin's purse, which was seized by the Fordyce policeman when she was arrested. Neither the policeman arresting Ruth nor the Chief of Fordyce Police Force inventoried the purse. Both simply looked in the purse for weapons.

The letter, sealed and stamped, addressed to her mother, was opened by Sheriff Joe Pennington about 7:00 or 8:00 a.m. the morning after the escape. He inventoried the purse.

The knife was the one identified as having human blood on it. The billfold was J. Y. Cooper's, presumably containing

$35.00 at one time. The letter was very damaging to Ruth's case. It read in part:

> Warren and me are on the run. Just like Bonnie and Clyde . . . I broke him out of jail . . . If they say a man was killed, I killed him, not Warren. Just want you to know that Warren isn't making me do anything. I'm much worse than he is . . .

The appellant argues the search of the purse was not authorized as incidental to her arrest nor as a routine police inventory.

A search of an individual's personal effects is incidental to an arrest if it is conducted shortly thereafter at a jail. *U.S. . Edwards,* 415 U.S. 800 (1974). See also, *South Dakota* v. *Opperman,* 428 U.S. 364 (1976); Rules of Crim. Proc., Rule 12.2; and *Johnson* v. *State,* 252 Ark. 1113, 482 S.W.2d 600 (1972). The knife and billfold were properly seized according to these authorities.

The envelope is slightly different. Its contents and potential use as evidence, unlike the knife and billfold, were not readily visible, and were unknown when it was seized.

The sheriff said he opened it because he wanted to learn the whereabouts of the other escapees. It was still early in the morning after the escape. It was known that two men were shot. Several men had escaped from the Columbia County Jail, the exact numbers and whereabouts of the escapees were unknown.

The question is, was the search reasonable as required by the Fourth Amendment of the U.S. Constitution? We believe it was not only reasonable and proper but that the sheriff was fully justified in opening the letter. He might have been derelict in his duty if he had not.

Either as an inventory, hours after the arrest, or as a search incident to the arrest, these items from her purse were properly seized and properly admitted as evidence.

Ruth Sumlin wrote another incriminating letter while she was in jail. It was addressed to her mother. she delivered it unsealed to a jail attendant. She had been told it would be read. This letter was properly seized. Jail officials may examine certain communications of a prisoner as a matter of security. *Green v. Maine,* 113 F.Supp. 253 (D.Me. 1953). For the same reason, a note she wrote on a paperback book and tried to slip to Warren Sumlin was also properly seized. Ruth Sumlin had already participated in one jailbreak, and the officials were fully justified in seizing these items. See also *Carpenter v. State,* 536 F.2d 759 (8th Cir. 1976).

After the jury had been instructed by the trial judge and had begun their deliberations, they returned and the foreman asked the judge if the State had to prove both robbery and escape in the first degree to find Sumlin guilty of capital felony murder. The judge told the jury either one would be enough and read again the appropriate instructions. Then the foreman said:

FOREMAN: Your Honor, if the defendant was an unwilling accomplice to the actual shooting, would that change it in any way?

THE COURT: I'm not sure how whoever is asking the question is defining the word 'unwilling.' And again, I think that if you will read the second part of the instruction on capital murder, the one that's entitled 'Second,' I believe it would answer your question.

I don't want to prejudice anybody, and that's why I'm not sure what you mean by unwilling.

I may have one idea under the law of what unwilling might be, but you may be looking at it in a different sense.

And in the course of and in the furtherance of that crime, either robbery or burglary, or the flight therefrom, that Ruth Della Sumlin, or a person acting with her in that case would be an accomplice. It does not say whether that accomplice is willing or unwilling.

The law makes no distinction.

DEFENSE ATTORNEY: Your Honor, I object to that interpretation of the law very strenuously, and you will note my exceptions.

THE COURT: The objection is so noted.

'That he caused the death of J. Y. Cooper under circumstances manifesting an extreme indifference to the value of human life.'

There's further an instruction that tells you what an accomplice is. Then I think that should answer your questions. If it doesn't, try again, and come back and I'll try to go further with it.

Sumlin argues the trial judge by his comments erroneously interpreted the law. We find the judge's remarks did not amount to prejudicial error.

A trial judge, once instructing a jury, should refain from elaborating on them, for such remarks, if in error, can lead to the necessity for a new trial. See Rules of Crim. Proc., Rule 33.4. Cf. *Western Coal & Mining Company* v. *Kranc*, 193 Ark. 426, 100 S.W.2d 676 (1937). (Judge's remarks during trial must be impartial).

However, the judge's remarks were not improper. Whether one is "willing" or "unwilling" is not at issue in a criminal trial. Instructions, based on the Arkansas Criminal Code, use words designed to, so far as possible, define culpable conduct. For example, the Code uses the words "purposely", "knowingly", and "recklessly." All of these words were defined by the judge in his instructions. Knowingly means:

KNOWINGLY — A person acts knowingly with respect to his conduct or the attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exist. A person acts knowingly with respect to a result of his conduct when he is aware

that it is practically certain that this conduct will cause such a result.

The judge referred the jury to his instruction on accomplice liability. It reads:

You are instructed that a person may commit an offense either by his own conduct or that of another person.

A person is criminally liable for the conduct of another person when he is an accomplice of another person in the commission of an offense.

A person is an accomplice of another person in the commission of an offense if with the purpose of promoting or facilitating the commission of an offense, he:

(a) solicits, advises, encourages or coerces the other person to commit it; or

(b) aids, agrees to aid, or attempts to aid the other person in planning or committing it.

"Unwilling" is defined as withholding consent, loath, reluctant, adverse. Webster's New International Dictionary, 34d Edition, Unabridged. One can reluctantly participate in a crime and still be guilty according to our law. The key to criminal conduct in such a case as this is knowledge, as it was defined, and accomplice, as it was defined. The judge correctly referred the jury back to his original instructions; it is not a defense that one "unwillingly" participated in a crime.

Duress is a defense, and perhaps this is what the appellant had in mind. However, the trial judge was not requested to instruct the jury on duress. Having failed to ask for such instruction precludes the argument that such an issue should have been addressed. *Baughman v. State*, 265 Ark. 869, 582 S.W.2d 4 (1979).

Several black and white photographs were admitted which showed the nearly nude body of Cooper. It is argued the photographs were gruesome and inflammatory, showing

the apparent mutilation of Cooper's sexual organ. Indeed, the crime charges was gruesome but the photographs merely were evidence of the crime committed. They were relevant to who committed the crime, how it was committed and where it was committed. The trial judge excluded several photographs, avoiding any duplication. Our rule on the admission of photographs of this nature has been evenly and uniformly applied:

> . . . However inflammatory they may be, they are admissible in the discretion of the trial judge, if they tend to shed light on any issue or are useful to enable a witness to better describe the objects portrayed or the jury to better understand the testimony or to corroborate testimony . . . Perry v. State, 255 Ark. 378, 381, 500 S.W.2d 387, 390 (1973).

We find no error in admission of the photographs.

The trial judge granted the appellant a continuance in March, 1978. A request for another continuance was filed on the date of the trial reciting two reasons. First, that the trial judge had not ruled on the motions to suppress certain evidence, which were the subject of a *Denno* hearing for two days, March 1st and March 2d. Second, that a newspaper article the day before the trial indicated certain accomplices of Sumlin had pled guilty.

The *Denno* hearing was long, detailed and permitted the defense to explore in detail the circumstances surrounding the seizure of critical evidence. It knew all that was possible regarding the State's case. We can see no prejudice in the fact the judge did not formally rule until the trial commenced.

There was no proffer of any evidence of prejudice resulting from the newspaper article, it was merely attached to the motion.

A trial judge has a duty to promptly try cases. One continuance had been granted to permit counsel to adequately prepare for trial. In the absence of any evidence of prejudice, or abuse of discretion, a trial judge's decision on a con-

tinuance request will remain undisturbed. *Russell & Davis* v. *State*, 262 Ark. 447, 559 S.W.2d 7 (1977). We find that to be the case here.

The appellant argues the trial judge erroneously refused four offered instructions. One was that the State must prove beyond a reasonable doubt that the defendant emasculated Cooper. The court properly refused this instruction. That fact was not an element of robbery or murder. Only elements of a crime must be proved beyond a reasonable doubt. *Patterson* v. *New York*, 432 U.S. 197 (1977).

The other three instructions were covered by instructions given by the court. The trial judge is not required to say the same thing in different ways. *Butler* v. *State*, 261 Ark. 369, 540 S.W.2d 651 (1977).

Once again Arkansas statutes which permit the imposition of the death penalty are challenged. We have answered most of the questions raised in prior cases. See *Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1977). In fact, a defendant sentenced to life imprisonment without parole lacks standing to challenge the death penalty. *Venable* v. *State*, 260 Ark. 201, 538 S.W.2d 286 (1976). We have held before that death penalty cases, like *Furman* v. *Georgia*, 408 U.S. 238 (1976), cannot be used to limit a jury's discretion in imposing a life sentence.

The new argument is that since Sumlin was charged with murder in the course of furtherance of two felonies, robbery and first degree escape, the jury could find her guilty of capital murder in the course of either or only one felony. That is, the jury had too much discretion.

The trial judge clearly instructed the jury that it could find her guilty of capital felony murder if she killed Cooper, either to rob him or in furtherance of the escape. There is no unreasonable discretion in such circumstances, the jury must find her guilty of murder committed in the course of or in furtherance of a defined felony.

The Arkansas law defines what felonies subject one to a

charge of capital felony murder — murder in the course of furtherance of rape, kidnapping, arson, vehicular piracy, robbery, burglary or escape in the first degree. Ark. Stat. Ann. § 41-1501.

The appellant's argument is essentially that the State must choose one of these felonies to be fair to a defendant. Such a position would, indeed, be unfair to the State, permitting a defendant such as Sumlin, who participated in a wild escapade, to go before a jury accountable for only a part of a related course of misconduct.

Affirmed.