Johnny SCROGGINS *v.* STATE of Arkansas

CR 81-131                                          633 S.W.2d 33

Supreme Court of Arkansas
Opinion delivered May 24, 1982

*Garner Taylor, Jr.,* Deputy Public Defender, for appellant.

*Steve Clark,* Atty. Gen., by: *William C. Mann, III,* Asst. Atty. Gen., for appellee.

DARRELL HICKMAN, Justice. Johnny Scroggins was arrested without a warrant for two counts of aggravated robbery at his motel room in Fort Smith, Arkansas. He was registered under the name of Johnny Smith. Scroggins'

codefendant, Earl Maxwell, was with him in the motel room and apparently registered under the name of Danny Maxwell. Scroggins was convicted of two charges of aggravated robbery and sentenced to eighty-three years.

The two main issues before the trial court were whether the arrest was legal; and, if not, did that taint and make inadmissible a subsequent confession of Scroggins'. The trial court ruled for the State on those two issues. We disagree and reverse on both questions.

Scroggins and Maxwell were reported to have robbed two people that Scroggins personally knew in the early morning hours of November 1, 1980. Immediately after the robbery one of the victims, George Yonkers, reported it to the police. He knew Scroggins only as "Johnny," a friend of one of his neighbors. The neighbor, Clifta Corley, was acquainted with both Scroggins and Maxwell. They were also charged with robbing her.

Detective Mike Brooks testified that on November 3, 1980, he went to the prosecuting attorney's office to obtain a warrant for the arrest of Scroggins and Maxwell for the aggravated robbery of Yonkers and Corley. He signed an affidavit and it was dated the third of November. Brooks told two other detectives, Officers Tate and Davis, who were working the night shift, that he had obtained a warrant that morning for Scroggins' and Maxwell's arrests. Actually he had only signed an affidavit; the warrants had not been issued.

The two detectives decided that they would try to locate the pair that evening. Davis testified that when they left the station they had been told warrants were issued and that eyewitnesses had identified Scroggins and Maxwell as the robbers. (Tate was later killed in the line of duty and did not testify at the trial.) Davis said he also knew that there was an outstanding warrant against Scroggins for third degree battery but he did not have that warrant with him either. Such a warrant did exist and was dated September 18.

Working that night on a hunch the officers discovered

that a Johnny Smith and Danny Maxwell had registered at the Holiday Motel, but had checked out. A girl friend of Maxwell's had called the bus station asking for Maxwell and left a number to be called at the Holiday Motel. Checking another motel in the vicinity, the Englander, the officers discovered that a Johnny Smith and Danny Maxwell were registered there using identical addresses to those at the Holiday Motel. Officer Davis did not know that Scroggins was registered as Johnny Smith when he approached the room. Davis said that he and Tate knocked on the door and informed the occupants that they were police officers. Scroggins, whom Tate recognized, came to the door. One officer drew his pistol and asked Scroggins to open the door and come out. Scroggins did not resist. Then the officers saw Maxwell in the rear of the room and, with drawn revolvers, ordered him out. He came out. Both were arrested for aggravated robbery and taken to the police station, booked, and jailed. A jacket and two suitcases were seized from the room. Detective Tate questioned Scroggins that night but evidently the questioning stopped when Scroggins indicated he wanted an attorney. The next day at about 11:55 a.m., Officer Brooks took a detailed five page incriminating statement from Scroggins.

It is argued that the statement was inadmissible because it was not voluntarily given and was the product of an illegal arrest. We hold that the arrest was illegal because Scroggins had a fourth amendment right to expect privacy in his motel room. Absent exigent circumstances, Scroggins was not subject to arrest without a warrant, unless he consented to the arrest. The State offered no evidence of exigent circumstances. Instead it chose to argue at trial and on appeal that the officers acted in good faith and that the motel room was not the residence of Scroggins and, therefore, not subject to constitutional protection. At the time of his arrest Scroggins gave his residence as 1701 Fresno, which was not the address of the Englander Motel.

The crucial question is the legal status of the motel room. In the companion cases of *Payton* v. *New York* and *Riddick* v. *New York*, 445 U.S. 573 (1980), the United States Supreme Court unequivocally held that the fourth amend-

ment as applied to the states through the fourteenth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest absent exigent circumstances. The Court did not extend its ruling to searches or arrests occurring at a third party's home. *Payton* v. *New York, supra* at 583.

The Court has held that the fourth amendment prohibition against warrantless seizures goes to persons as well as property. *Davis* v. *Mississippi*, 394 U.S. 721 (1969). Of course it is elementary that the State must prove that a warrantless intrusion, in this case an arrest, was not in violation of the fourth amendment. In *Katz* v. *United States*, 389 U.S. 347 (1967), the Court explained that,

> . . . searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.

So it is the State's burden to prove that the motel room in this case was not subject to constitutional protection.

The fourth amendment protects the right one has to expect privacy in various places. While that right extends to one's home, and to the trunk of an automobile, *Sanders* v. *Arkansas*, 442 U.S. 753 (1979), it does not extend to a public place such as a common hallway in an apartment building, *U.S.* v. *Calhoun*, 542 F.2d 1094 (9th Cir. 1976), or a parking lot, *U.S.* v. *Cantu*, 557 F.2d 1173 (5th Cir. 1977) cert. denied 434 U.S. 1063 (1977).

Two cases of the United States Supreme Court have held that one's right of privacy in a hotel or motel room is protected by the fourth amendment to the United States Constitution. In *Johnson* v. *United States*, 333 U.S. 10 (1947), the Court found that the defendant's living quarters, which were in a hotel, could not be searched without a warrant absent exigent circumstances. In *Stoner* v. *California*, 376 U.S. 483 (1964), a defendant was arrested in a

hotel room and the room was searched without either a search warrant or an arrest warrant, and the search was found to be illegal. It was the government's argument that the hotel clerk consented to the search. The Court said:

> No less than a tenant of a house, or the occupant of a room in a boarding house, *McDonald* v. *United States*, 335 U.S. 451, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures. *Johnson* v. *United States*, 333 U.S. 10. That protection would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel. It follows that this search without a warrant was unlawful. Since evidence obtained through the search was admitted at the trial, the judgment must be reversed. *Mapp* v. *Ohio*, 367 U.S. 643.

Therefore, it does not matter that a hotel or motel room is not a permanent residence; one registered at a motel or hotel as a guest is protected against unreasonable searches and seizures by the fourth amendment to the United States Constitution. The fact that Scroggins was registered under a false or assumed name would not change the situation because that fact was not used by the State to justify the warrantless arrest and, therefore, in this case becomes irrelevant.

The State offers a parenthetical argument that Scroggins consented to leave the room and was actually arrested outside the room and, therefore, no *Payton* issue exists. The facts demonstrate why this argument is meritless. The officers held a gun on Scroggins and asked him to come out of the room; obviously there could be no free choice on the part of Scroggins in such a situation.

Having decided that the arrest was illegal, and necessarily that the seizure of the suitcases and jacket was illegal, we consider the separate question of the admissibility of Scroggins' confession. When an in-custody statement is challenged, the State has the burden of proving by a preponderance of evidence that it was voluntarily given. On appeal, we make an independent determination of this issue

and affirm the trial court's ruling unless it is clearly erroneous. *Coble* v. *State*, 274 Ark. 134, 624 S.W.2d 421 (1981).

In this case, such a statement must be examined not only to determine if it was voluntary by the fifth amendment standards but also to make certain that the illegal arrest did not taint the statement. In the case of *Brown* v. *Illinois*, 422 U.S. 590 (1975), the United States Supreme Court enumerated three factors to be used in determining whether a prior illegal arrest has tainted any incriminating statements made after the arrest: (1) The "temporal proximity between the arrest and the confession, (2) the presence of intervening circumstances, . . . (3) the purpose and flagrancy of the official misconduct are all relevant." The Court noted that merely giving the *Miranda* warning is not sufficient to remove the taint. The Court held in *Wong Sun* v. *United States*, 371 U.S. 471 (1965) that there must be an intervening action of free will between the illegal arrest and the subsequent confession to remove the taint. *See Woodard* v. *State*, 273 Ark. 235, 617 S.W.2d 861 (1981), and *Brewer* v. *State*, 271 Ark. 810, 611 S.W.2d 179 (1981).

Applying those principles to Scroggins' confession, we conclude that the State did not meet its double burden. Scroggins testified that he was questioned on the evening of November 3rd by Detective Tate who arrested him, but that he told him he wanted a lawyer and the officer discontinued the questioning. That is not refuted and it is borne out in part by the record. At noon the next day, Detective Brooks, an officer not connected with the arrest, interviewed Scroggins and obtained a five page statement. It is undisputed that Scroggins was given his *Miranda* rights at this time. Officer Brooks had Scroggins' two suitcases before him when he questioned Scroggins. He asked Scroggins if he could search them. Scroggins admitted during his testimony that he consented to the officer examining the contents of the suitcases at that time, but he explained that Officer Tate had already searched them the night before.[1] The suitcases did

[1] Apparently Officer Tate obtained a written consent to search the suitcases the night before on the basis of some agreement between Scroggins and him as to the other charges.

contain evidence connecting Scroggins to the robberies in question. Scroggins said he asked Brooks for a lawyer and asked to make a telephone call. Brooks said he did not ask for a lawyer but he could not remember if Scroggins made a telephone call.

Once Scroggins asked for an attorney, as he did when he was first questioned, he could not be interrogated later except at his request. *Edwards* v. *Arizona*, 451 U.S. 477 (1981). It appears undisputed that the State initiated the interrogation the next day. Officer Brooks conceded that he did not obtain written consent to search the suitcases when he interrogated Scroggins, although it was departmental policy to do so.

We cannot say the officers acted in good faith. They set out to find these men during their shift without any warrants and offered no evidence of exigent circumstances requiring immediate action. The only real basis to uphold the trial court's findings would be that Scroggins was given his *Miranda* warning before the statement was taken. There is no other evidence to support a finding that the State met its burden and removed the taint of the illegal arrest. There was no intervening action of free will to remove the taint.

The other arguments raised on appeal are easily answered. First, it is argued that it was error to allow the State to cross-examine Scroggins regarding his prior convictions because he was charged as an habitual criminal and, thereby, he was forced to prove the convictions, which was the State's burden. We rejected that same argument in *Coleman* v. *State,* 256 Ark. 665, 509 S.W.2d 824 (1974).

He argues that one of his convictions was actually "court probation" and according to our decision in *English* v. *State,* 274 Ark. 304, 626 S.W.2d 191 (1981), it was not a conviction that could be used to enhance his sentence pursuant to Ark. Stat. Ann. § 41-1001 (Supp. 1981), the habitual offender statute. Scroggins' probation was not the type of court probation that we discussed in *English.* Scroggin's plea of guilty was entered and accepted and,

therefore, no error was committed in allowing this conviction to be considered by the jury.

He argues the evidence is insufficient to support the conviction for aggravated robbery of Clifta Corley. She testified that she knew Scroggins and was awakened that night by Scroggins and Maxwell who wanted money, and at first she thought they were joking. But then she changed her mind when she saw her roommate crying and Scroggins continued to point the gun at her. We find substantial evidence to support this charge of robbery.

Finally, it is argued that Scroggins' sentence to eighty-three years was excessive. We have repeatedly held that such arguments are meritless. *Kaestel* v. *State,* 274 Ark. 550, 626 S.W.2d 940 (1982); *Osborne* v. *State,* 237 Ark. 5, 371 S.W.2d 518 (1963).

Reversed and remanded.