James Theral METCALF *v.* STATE of Arkansas

CR 84-87                                    681 S.W.2d 344

Supreme Court of Arkansas
Opinion delivered December 17, 1984

*Kennard K. Helton,* for appellant.

*Steve Clark,* Att'y Gen., by: *Velda P. West,* Asst. Att'y Gen., for appellee.

GEORGE ROSE SMITH, Justice. On March 23, 1983, at 6:55 a.m., the Plainview fire department was called to a fire at Horn's grocery, which was also the residence of Samuel, Mabel, and John Horn. At the scene the firemen learned that the three Horns were still inside the burning building. In extinguishing the fire the firemen found the bodies of the

three Horns, all of whom had died not from the fire but from having their heads battered and their throats cut. It later appeared that the victims had also been robbed. The appellant Metcalf was convicted on three counts of capital murder and sentenced to life without parole on each count. We need discuss in detail only one of his five arguments for a new trial.

At a hearing on a motion to suppress an in-custody statement given by Metcalf, the weight of the testimony showed that when Metcalf was arrested on the night of March 23 he asked for a lawyer, but none was provided. The next morning he was taken from his cell for questioning. An officer testified that when Metcalf was again reminded of his rights he started talking "a mile a minute" even though an officer tried to stop him. A tape recorder was turned on and took the rest of his statement, which was introduced at the trial.

The trial judge, in ruling that the statement was admissible, recognized the difficulty: "I do want to state this: This man did request a lawyer and . . . I have some serious problems with it." The judge concluded, however, that Metcalf had waived his rights when he was reminded of them and kept talking.

The judge's ruling was wrong. When a person in custody indicates that he wants a lawyer, under the Miranda rule the interrogation must cease. *Moore v. State*, 261 Ark. 274, 551 S.W.2d 185 (1977); *Davis v. State*, 243 Ark. 157, 419 S.W.2d 125 (1967). It is true that the accused person may change his mind and initiate further contact with the officers, but the impetus must come from the accused, not from the officers. *Oregon v. Bradshaw*, ___ U.S. ___ , 103 S. Ct. 2830 (1983); *Edwards v. Arizona*, 451 U.S. 477 (1981); *Scroggins v. State*, 276 Ark. 177, 633 S.W.2d 33 (1982). Here Metcalf was admittedly taken from his cell for questioning. He should not have been put in that position without a lawyer being present; so his supposed willingness to make an uncounseled statement is immaterial.

Since a new trial is necessary, we mention the other four

points. First, the death-qualification of the jury was not improper. *Rector* v. *State,* 280 Ark. 385, 659 S.W.2d 168 (1983). Second, Metcalf's wife could be required to testify for the State, for she was not asked to disclose any confidential communications. Uniform Evidence Rules 501 and 504; *Huckaby* v. *State,* 262 Ark. 413, 557 S.W.2d 875 (1977). Third, defense counsel conceded that the State could question Mrs. Metcalf about her prior inconsistent statements, for impeachment. It is argued that the entire statement should not have been admitted; but the statement was brief, and we do not see that the non-impeaching portion conveyed any prejudicial information to the jury. See *Davis* v. *Ark. Best Freight System,* 239 Ark. 632, 393 S.W.2d 237, 17 A.L.R. 3d 986 (1965).

Fourth, while in jail awaiting trial Metcalf wrote a letter to his wife, urging her and other witnesses to commit perjury in several respects at the trial. Metcalf put the letter in an unsealed envelope and asked a fellow prisoner who was confined for only 10 days, to smuggle it to Metcalf's wife. The inmate, however, turned the letter over to the sheriff, and it was introduced in evidence by the State.

It is argued, first, that the letter was inadmissible, because in entrusting it to the other inmate Metcalf had an expectation of privacy and of freedom from an unreasonable search. We have held, however, that jail officials may examine an unsealed letter written by an inmate. *Sumlin* v. *State,* 266 Ark. 709, 587 S.W. 2d 571 (1979). Further, we agree with a California decision upholding the admissibility of a letter entrusted by the writer to a fellow prisoner and turned over to the sheriff. *People* v. *Hunt,* 133 Cal. App. 3d 543, 184 Cal. Rptr. 197 (1982). There the court said: "The general rule is that an inmate at a jail has no right to privacy. . . .Lack of privacy is a built-in aspect of imprisonment, with censorship and control of communications to and from a jail inherent in its administration. Such authority is necessary to protect against escape.' "

Second, counsel argues that the letter was inadmissible as being a confidential communication to Metcalf's wife. An oral communication between spouses, however, is not

protected when it is overheard by a third person. *Sumlin v. State,* 273 Ark. 185, 617 S.W.2d 372 (1981). Similarly, Metcalf waived any possible confidentiality of the letter by delivering it unsealed to a fellow inmate.

The State's motion for an award of costs for a supplemental abstract is denied. The additional material goes largely to the sufficiency of the State's proof, a matter not questioned by the appellant.

Reversed and remanded.

HUBBELL, C.J., and HICKMAN and HAYS, JJ., dissent.

WEBB HUBBELL, Chief Justice, dissenting. I respectfully disagree with my colleagues' reversal of this case. I disagree with the majority's statement that the weight of the testimony showed that when Metcalf was arrested on the night of March 23 he asked for a lawyer, but none was provided. On March 23, 1983, appellant was arrested at 8:00 p.m. At 9:01 p.m. James Metcalf signed a standard statement of rights form which included his acknowledgment that he understood he had a right to remain silent, that he had a right to consult an attorney, and that he had the right to stop any questioning at any time. In fact, appellant said he did not want to talk that night, and no further questioning was even attempted.

Appellant testified that he asked Jim Pickens, an honorary deputy sheriff, for an attorney the night of his arrest. Jim Pickens testified that appellant asked if he would be able to get an attorney, and Pickens said, "Yes, I'm sure you will." Neither appellant nor Pickens pinpointed the time this conversation took place. Appellant also failed to establish what authority this "honorary deputy sheriff" has to bind the state. Appellant also testified that he asked two other officers for an attorney. The officers both testified that no such request was made.

At 9:15 the next morning, the appellant was brought in for questioning. All three officers present testified that appellant did not request either a phone call or an attorney.

Appellant was again reminded of his rights, and appellant started talking "a mile a minute" even though an officer tried to stop him until the tape recorder could be started. A careful review of the transcript does not reveal even a hint of reluctance on the part of appellant to give a statement. The trial court was not clearly erroneous in admitting into evidence appellant's statement.

The facts in this case warrant a finding of waiver. Appellant was found guilty of the savage murder of three people. The evidence of appellant's guilt was substantial. There is, however, absolutely no evidence that appellant's statement was not freely and voluntarily given. While in custody, and after twice being advised of his rights to remain silent and to have counsel, appellant gave a voluntary statement. Appellant had not been languishing in jail for days. There is no assertion, and no evidence, that appellant had been starved, beaten, threatened, coerced, enticed, or mistreated in any way. Appellant was arrested at 8:00 p.m., was given notice of his constitutional rights, and was allowed to remain silent. The next morning, after again being reminded of his rights, he freely gave a statement. There is no evidence that he acted without full awareness of his constitutional rights. Indeed, upon questioning by the police, appellant repeatedly responded that he understood his rights. I believe appellant waived his right to counsel. A waiver is an intentional relinquishment of a known right or privilege. *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938).

I believe these facts warrant something more than just an automatic imposition of the exclusionary rule. I recognize that the majority is operating from what it believes to be a long line of precedent and mandate from the United States Supreme Court, but I believe that precedent is eroding. See *Nix* v. *Williams*, 104 S. Ct. 2501 (1984). It is time we balanced the scales of justice in reviewing cases where there are important competing interests. In balancing we must be careful that we do not open the floodgates to the introduction of illegally seized evidence. Such a result would be inherently inimical to the rationales traditionally invoked to justify the exclusionary rule — deterrence of police misconduct and preservation of judicial intergrity. We must

carefully balance the wisdom of striving to enhance deterrence of official misconduct against the high social costs of excluding probative evidence.

The exclusionary rule is in no sense a personal constitutional right, but a judicially conceived remedial device designed to safeguard and effectuate guaranteed legal rights. *Stone* v. *Powell,* 428 U.S. 465 (1976). Involuntary and coerced admissions are suppressed because of the inherent unreliability of a confession wrung from an unwilling suspect by threats, brutality, or other coercion. *Schneckloth* v. *Bustamonte,* 412 U.S. 218 (1973). We all agree on society's abhorrence to the use of involuntary confessions. *Linkletter* v. *Walker,* 381 U.S. 618, 638 (1965). But use of appellant's disclosure carries no risk whatsoever of unreliability. No dangers are posed to individual dignity or free will since there is not an issue of coercion or threats.

The consequence of the majority's decision is extremely serious. Why? Apparently the answer is that the majority believes that the law enforcement officers acted in a way which involves some risk to society and that such conduct should be deterred. The officers' conduct did not and was not likely to jeopardize the fairness of appellant's trial or in any way risk the conviction of an innocent man — the risk against which the Sixth Amendment guarantee of assistance of counsel is designed to protect. *Powell* v. *Alabama,* 287 U.S. 45 (1932); *Johnson* v. *Zerbst,* 304 U.S. 458 (1938).

I would not automatically impose the exclusionary rule but would adopt a balancing test. Where, as here, there is no egregious conduct on the part of the law enforcement officers, no evidence that the statement was anything less than voluntary, and the other evidence against the appellant is so substantial that there is no risk of a conviction of an innocent man, I would hold that the introduction of the statement is not reversible error.

I respectfully dissent.

HAYS, J., joins in this dissent.